[No. A091113. First Dist., Div. Five. Dec. 10, 2001.]

ALBERT F. GIONFRIDDO, Plaintiff and Appellant, v.
MAJOR LEAGUE BASEBALL et al., Defendants and Respondents.

[No. A092225. First Dist., Div. Five. Dec. 10, 2001.]

PETER J. COSCARART et al., Plaintiffs and Appellants, v.
MAJOR LEAGUE BASEBALL et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, parts I.C.3 and II of this opinion are not certified for publication.

## COUNSEL

Coudert Brothers, Ronald Katz, William N. Hebert and Jeffrey G. Benz for Plaintiff and Appellant in No. A091113 and for Plaintiffs and Appellants in No. A092225.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Martin R. Glick, Daniel B. Asimow, Jeffrey E. Faucette and Peter J. Drobac for Defendants and Respondents Major League Baseball Properties, Inc., The PHoenix Communications Group, Inc., and specially appearing for Major League Baseball.

Elizabeth W. Scott for Defendant and Respondent Major League Baseball Properties, Inc.

## OPINION

**SIMONS, J.**—By an order separately filed, we consolidate the appeals from two related actions heard in the Superior Courts of Alameda and San Francisco Counties. In part I of this decision, we consider plaintiffs'[1] appeal from a judgment entered in the Alameda action, following the granting of a motion for summary judgment in favor of defendants Major League Baseball, Major League Baseball Properties, Inc., and The PHoenix Communications Group, Inc. (hereafter collectively Baseball). Resolution of this appeal requires, in part, a reconciliation of the interests protected by plaintiffs' common law and statutory rights of publicity and the constitutional right to free expression. We affirm the trial court's decision permitting Baseball's use of plaintiffs' names, images and likenesses, and the trial court's determination that the two causes of action for declaratory relief were not supported by sufficient evidentiary facts and did not present an actual controversy between the parties.[2]

In part II, an unpublished portion of this decision, we consider the appeal of plaintiff Albert F. Gionfriddo from the trial court's judgment and the

---

[1]The plaintiffs named in the original Alameda County complaint were: Peter J. (Pete) Coscarart who played for the Brooklyn Dodgers and the Pittsburgh Pirates; Adolph L. (Dolph) Camilli who played for the Chicago Cubs, the Philadelphia Phillies, the Brooklyn Dodgers, and the Boston Red Sox; Frank P. (Frankie) Crosetti, who played for the New York Yankees; and Albert F. (Al) Gionfriddo, who played for the Pittsburgh Pirates and the Brooklyn Dodgers. Later, Gerda Camilli joined the lawsuit, both as successor in interest to Mr. Camilli and as a plaintiff in her own right based upon her registration with the California Secretary of State pursuant to former Civil Code section 990, now Civil Code section 3344.1. (Stats. 1999, ch. 1000, § 9.5.)

[2]The parties have stipulated that Major League Baseball exists as a separate entity for purposes of this action. A separately represented fourth defendant, Photo File, Inc. (Photo

order granting Baseball's motion for attorney's fees in the San Francisco action. Gionfriddo contends that Baseball did not qualify as the "prevailing party" in this case because he dismissed this action for reasons unrelated to the merits of his case, before the merits of the case were finally decided, and with Baseball's cooperation. We conclude Baseball prevailed because it realized its objectives in contesting the San Francisco action and, therefore, we affirm.

I

APPEAL NO. A092225: THE ALAMEDA ACTION

A. *Factual and Procedural Background*

The material facts underlying the summary judgment motion are not in dispute. Plaintiffs were four professional baseball players, who played in the major leagues for different periods between 1932 and 1948. Plaintiffs were paid for their performances during each of these seasons.

Defendant Major League Baseball is an unincorporated association whose members include the Major League Baseball Clubs (Clubs). The Clubs acted collectively to create the office of the commissioner which, in turn, produced and distributed media guides to the press at All-Star and World Series games.

Defendant Major League Baseball Properties, Inc. (MLBP), is a limited agent for each of the Clubs for certain purposes involving the use of the Clubs' trademarks. MLBP licenses the use of each Club's right to the game-related images of its current and former players. MLBP produces certain print and video publications including All-Star and World Series programs of its own. It also owns and controls the official Web site of Major League Baseball found at <http://majorleaguebaseball.com>. Among other things, this site provides historical information about major league baseball, including rosters, box scores, game summaries, lists of award winners, and video clips of historic moments from past games.

Defendant The PHoenix Communications Group, Inc. (PHoenix), was authorized by MLBP to produce and distribute audiovisual programs containing game performances and related activities. For 13 years between 1985 and 1998, PHoenix produced certain television shows including: *This Week in Baseball, Pennant Chase,* and *Major League Baseball Magazine,*

---

File), also moved for summary judgment below. The trial court only partially granted Photo File's motion, and that matter is not part of this appeal.

containing footage of earlier games. It also satisfied video footage requests made by third parties.

It is undisputed that plaintiffs brought great skill to the game of baseball and participated in memorable moments from baseball's past. Coscarart, Camilli and Crosetti appeared in All-Star games, and all four of them appeared in one or more World Series.[3] Plaintiffs' games were played before thousands of spectators and plaintiffs knew their performances were being covered by the media. Their photographs and statistics and accounts of their play were widely disseminated to the public. Plaintiffs understood the important role this media publicity held in promoting interest in professional baseball.

By virtue of their accomplishments and team associations, Baseball has included plaintiffs' names and statistics with other former players in assorted All-Star game and World Series programs, or on its baseball Web sites <http://majorleaguebaseball.com> and <http://www.mlbworldseries.com>. In some instances, plaintiffs' names have appeared within lists of team members or award winners such as the recipients of the "Most Valuable Player" award. In other instances, the references to plaintiffs have occurred in written accounts or video depictions of their play. Some plaintiffs have had still photographs from their playing days and footage of their performances included within video histories of major league baseball produced and/or distributed by defendants PHoenix and MLBP.

Plaintiffs filed this action, contending that these uses by Baseball were unauthorized and violated their rights of publicity. Plaintiffs pled the case originally as a putative class action on behalf of other retired players, alleging that Baseball had violated their statutory and common law right of publicity by using their "names, voices, signatures, photographs and/or likenesses" without their consent and without compensation. Their initial complaint was limited to persons who had played part of their major league careers prior to 1947, because that year the standard player contract was revised to add the following language: "[3.] (c) The Player agrees that his picture may be taken for still photographs, motion pictures or television at such times as the Club may designate and agrees that all rights in such pictures shall belong to the Club and may be used by the Club for publicity purposes in any manner it desires." The complaint sought damages for the

[3]Coscarart was a member of the 1940 All-Star team and played in the 1941 World Series. Camilli was listed in the 1939 and 1941 All-Star game rosters and played in the 1941 World Series. Crosetti was listed in the 1936 and 1939 All-Star game rosters and played with the Yankees in the 1932, 1936, 1937, 1938, 1939, 1942, and 1943 World Series. Gionfriddo played in the 1947 World Series.

unauthorized uses, along with an injunction against such uses in the future, and a declaration that all members of the class were entitled to exploit commercially their own images in the uniforms in which they played.

Later, plaintiffs moved unsuccessfully for class certification. The trial court denied their motion and this court affirmed that ruling in a separate appeal entitled *Block v. Major League Baseball* (1998) 65 Cal.App.4th 538 [76 Cal.Rptr.2d 567]. After class action status was eliminated from the case, plaintiffs filed a second amended complaint in which they asserted their individual claims against Baseball. At that time, Gionfriddo and Crosetti expanded their claims to include uses by Baseball of their post-1946 images.

In due course, Baseball moved for summary judgment or, in the alternative, for summary adjudication. The trial court granted summary judgment, finding that the challenged uses of plaintiffs' names, images and likenesses: (1) were all " 'in connection with [a] news, public affairs, or sports account' " within the meaning of Civil Code[4] section 3344, subdivision (d), and as such did not constitute a "use" for which consent was required under subdivision (a) of that section; (2) constituted publication of matters in the public interest, and as such were protected from civil liability by the First Amendment of the United States Constitution; and (3) were legally permissible under the doctrine of master-servant.

As to Gionfriddo, the court also determined that the uses by Baseball of his name and images were permissible under paragraph 3(c) of the Uniform Players Contract. The court concluded that the causes of action for declaratory relief were not supported by sufficient evidentiary facts and did not present an actual controversy between the parties. The court ruled that Gerda Camilli could not state a claim for damages under former section 990, subdivision (f), based on her concession that there had been no uses of her husband's images after she had registered with the Secretary of State in March 1998 under that section. Lastly, the court found the remaining causes of action for unfair competition, unjust enrichment and injunctive relief failed because they were derivative of plaintiffs' right of publicity claims.[5]

---

[4]All undesignated section references are to the Civil Code.

[5]Appellants have not raised any arguments on appeal concerning the trial court's ruling on the claims by Gerda Camilli under Civil Code section 3344.1, or on the derivative claims for unfair competition (Bus. & Prof. Code, § 17200), common law unjust enrichment, and "injunctive relief." Accordingly, we do not address the merits of these claims. Although our review of a summary judgment is de novo, it is limited to issues that have been adequately raised and supported in plaintiffs' briefs. Issues not raised in an appellant's brief are deemed waived or abandoned. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].)

## B. *Standard of Review*

■ We review a summary judgment de novo to determine whether the moving party has met its burden of persuasion that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493]; Code Civ. Proc., § 437c, subd. (c).) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment. [Citation.]" (*Lenane v. Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079 [72 Cal.Rptr.2d 121].) The moving party's affidavits are strictly construed and the opponent's are liberally construed. (*Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 [76 Cal.Rptr.2d 382].) In addition, we are not bound by the trial court's stated reasons in support of its ruling; we review the ruling, not its rationale. (*Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

■ When the defendant is the moving party, it must show either (1) that the plaintiff cannot establish one or more elements of a cause of action, or (2) that there is a complete defense. If that burden of production is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850; Code Civ. Proc., § 437c, subd. (*o*)(2).)

## C. *Discussion*

In California the right of publicity is both a common law right and a statutory right. (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 391 [106 Cal.Rptr.2d 126, 21 P.3d 797] (*Comedy III*).) The common law right of publicity has been recognized in this state since 1931. (*Melvin v. Reid* (1931) 112 Cal.App. 285 [297 P. 91]; see also Miller, *Commercial Appropriation of an Individual's Name, Photograph or Likeness: A New Remedy for Californians* (1972) 3 Pacific L.J. 651, 657.) In 1971, the Legislature enacted section 3344, which authorized recovery of damages by any living person whose name, photograph, or likeness was used for commercial purposes without his or her consent. Eight years later, in *Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813 [160 Cal.Rptr. 323, 603 P.2d 425, 10 A.L.R.4th 1150], our Supreme Court reaffirmed the common law right, which the statute was said to complement. (*Id.* at p. 819 & fn. 6.) However the Supreme Court held that, because the common law right of publicity derived from the right of privacy, it did not survive the death of the person whose identity was exploited and was not descendible to heirs or assignees.

(*Id.* at pp. 819-821.) In 1984, the Legislature enacted a second statutory right of publicity that was "freely transferable" to the assignees or passed to the heirs of deceased persons. (§ 3344.1, subds. (b)-(d).)

### 1. *Plaintiffs' Common Law Right of Publicity Cause of Action*

■ The common law right of publicity derives from the fourth category of invasion of privacy identified by Dean Prosser, described as "appropriation" of a plaintiff's name or likeness for the defendant's advantage. (*Comedy III, supra,* 25 Cal.4th at p. 391 & fn. 2, citing Prosser, *Privacy* (1960) 48 Cal. L.Rev. 383, 389.) Historically, courts were reluctant to permit celebrities to rely on this privacy right, since their fame seemed inconsistent with the injury to solitude or personal feelings implicitly required.[6] (Rest.3d Unfair Competition, § 46, Appropriation of the Commercial Value of a Person's Identity: The Right of Publicity, p. 529.) In *Haelan Laboratories v. Topps Chewing Gum* (2d Cir. 1953) 202 F.2d 866, 868, certiorari denied (1953) 346 U.S. 816 [74 S.Ct. 26, 98 L.Ed. 343], a court, for the first time, recognized a distinction between the personal right to be left alone and the economic right to exploit one's own fame. California recognizes the right to profit from the commercial value of one's identity as an aspect of the right of publicity. (*Comedy III, supra,* 25 Cal.4th at p. 391; *Dora v. Frontline Video, Inc.* (1993) 15 Cal.App.4th 536, 541-542 [18 Cal.Rptr.2d 790] (*Dora*).)

■ Plaintiffs allege that Baseball appropriated their names and likenesses. The elements of this tort, at common law, are: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. [Citations.]" (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 417 [198 Cal.Rptr. 342].) Even if each of these elements is established, however, the common law right does not provide relief for every publication of a person's name or likeness. ■ ■ ■ The First Amendment requires that the right to be protected from unauthorized publicity "be balanced against the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press. [Citations.]" (*Gill v. Hearst Publishing Co.* (1953) 40 Cal.2d 224, 228 [253 P.2d 441]; and see *Comedy III, supra,* 25 Cal.4th at pp. 401-402; *Downing v. Abercrombie &*

---

[6]The anomaly of a celebrity suing for loss of privacy was noted by Samuel Warren and Louis Brandeis in their 1890 essay that first adopted the term "right to privacy." "The general object in view is to protect the privacy of private life, and to whatever degree and in whatever connection a man's life has ceased to be private, before the publication under consideration has been made, to that extent the protection is to be withdrawn." (Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv. L.Rev. 193, 215, fn. omitted.)

*Fitch* (9th Cir. 2001) 265 F.3d 994, 1001 (*Downing*); *Hoffman v. Capital Cities/ABC, Inc.* (9th Cir. 2001) 255 F.3d 1180, 1183-1184 (*Hoffman*).)[7]

We believe this balancing process begins by identifying and weighing the factors properly taken into account. At a minimum, a court must first consider the nature of the precise information conveyed and the context of the communication to determine the public interest in the expression. The public interest must then be weighed against the plaintiffs' economic interests in cases of this sort and the plaintiffs' noneconomic interests if the publicity right relied on is rooted in privacy.

The precise information conveyed by Baseball in this case consists of factual data concerning the players, their performance statistics, and verbal descriptions and video depictions of their play. This information may fairly be characterized as mere bits of baseball's history: names of players included on All-Star and World Series rosters; descriptions of memorable performances from former games included within All-Star and World Series game programs created for the benefit of the media and the enjoyment of the fans; photographs and video clips taken of plaintiffs when they were playing the game themselves, and made available to the public through Web sites, home videos, and other programs presenting historic events from long ago. In short, they are fragments from baseball's mosaic.

It is manifest that as news occurs, or as a baseball season unfolds, the First Amendment will protect mere recitations of the players' accomplishments. "The freedom of the press is constitutionally guaranteed, and the publication of daily news is an acceptable and necessary function in the life of the community. [Citations.]" (*Carlisle v. Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 746 [20 Cal.Rptr. 405].) "Certainly, the accomplishments . . . of those who have achieved a marked reputation or notoriety by appearing before the public such as actors and actresses, *professional athletes,* public officers, . . . may legitimately be mentioned and discussed in print or on radio and television." (*Id.* at pp. 746-747.) Entertainment features receive the same constitutional protection as factual news reports. (*Zacchini v. Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562, 578 [97 S.Ct. 2849, 2859, 53 L.Ed.2d 965]; *Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 867 [160 Cal.Rptr. 352, 603 P.2d 454] (conc. opn. of

---

[7]Baseball has requested that the court take judicial notice of the decisions of the Ninth Circuit Court of Appeals in *Downing* and *Hoffman* pursuant to Evidence Code sections 451 and 459. "A request for judicial notice of published materials is unnecessary. Citation to the materials is sufficient. [Citations.]" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45-46, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513].) We therefore consider the request for judicial notice as a citation to the published decisions.

Bird, C. J.).)[8] Moreover, the public interest is not limited to current events; the public is also entitled to be informed and entertained about our history. (*Dora, supra,* 15 Cal.App.4th at p. 543.)

Major league baseball is followed by millions of people across this country on a daily basis. Likewise, baseball fans have an abiding interest in the history of the game. The public has an enduring fascination in the records set by former players and in memorable moments from previous games. Statistics are kept on every aspect of the game imaginable. Those statistics and the records set throughout baseball's history are the standards by which the public measures the performance of today's players. The records and statistics remain of interest to the public because they provide context that allows fans to better appreciate (or deprecate) today's performances. Thus, the history of professional baseball is integral to the full understanding and enjoyment of the current game and its players.

In the uses challenged, Baseball is simply making historical facts available to the public through game programs, Web sites and video clips. The recitation and discussion of factual data concerning the athletic performance of these plaintiffs command a substantial public interest, and, therefore, is a form of expression due substantial constitutional protection. (*Carlisle v. Fawcett Publications, Inc., supra,* 201 Cal.App.2d at pp. 746-747; *Rosemont Enterprises, Inc. v. Random House, Inc.* (1968) 58 Misc.2d 1, 6-7 [294 N.Y.S.2d 122, 128-129].)

Plaintiffs contend that the challenged uses are presented in a commercial context, and thereby constitute "commercial speech," entitled to a reduced level of constitutional protection, without regard to the precise information conveyed. They argue these uses help baseball owners make a profit, and that their "achievements are being exploited to promote the product of baseball with any historical value being a coincidence or merely incidental." Profit, alone, does not render expression "commercial," however. " 'The First Amendment is not limited to those who publish without charge. . . . [An expressive activity] does not lose its constitutional protection because it is undertaken for profit.' " (*Comedy III, supra,* 25 Cal.4th at p. 396, quoting *Guglielmi v. Spelling-Goldberg Productions, supra,* 25 Cal.3d at p. 868; accord, *Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 797, fn. 2 [40 Cal.Rptr.2d 639]; see also *Joseph Burstyn,*

[8]The concurring opinion of Chief Justice Bird in *Guglielmi v. Spelling-Goldberg Productions* was signed by Justices Tobriner and Manuel. The principles enunciated in her concurrence were also endorsed by Justice Newman. Therefore, Chief Justice Bird's views in *Guglielmi* held the support of the majority of the court. (*Comedy III, supra,* 25 Cal.4th at pp. 396-397, fn. 7.)

*Inc. v. Wilson* (1952) 343 U.S. 495, 501-502 [72 S.Ct. 777, 780, 96 L.Ed. 1098]; *Maheu v. CBS, Inc.* (1988) 201 Cal.App.3d 662, 675 [247 Cal.Rptr. 304].)

Plaintiffs rely on two recent Ninth Circuit Court of Appeals cases to argue that only "media business[es are] subject to First Amendment free speech/ press protections." This argument is meritless. In *Hoffman, supra,* 255 F.3d at page 1189, the Ninth Circuit held that L.A. Magazine could publish a digitally altered photograph of the actor, Dustin Hoffman, as "Tootsie," in a new designer dress to illustrate an article entitled *Grand Illusions.* In *Downing, supra,* 265 F.3d at pages 1102-1103, the same circuit held that defendant's publication of a photograph of plaintiffs in an advertising circular devoted to surfing was actionable. While it is true that the defendants in each case were in different businesses and that only the media business's publication prevailed, these facts were not determinative. In *Hoffman,* the court went to great lengths to explain that the actor's likeness was not published as an advertisement. (*Hoffman, supra,* at pp. 1185-1186.) It was precisely on that basis that the court in *Downing* distinguished the earlier *Hoffman* decision. (*Downing, supra,* at pp. 1102-1103, fn. 2.) It was not the business of the messenger, but the commercial nature of the message that distinguished the two decisions.[9]

 The uses challenged in this case are not "commercial speech." The term "commercial speech" has a special meaning in the context of the First Amendment. "[T]he 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.' " (*Hoffman, supra,* 255 F.3d at p. 1184, quoting *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 66 [103 S.Ct. 2875, 2880, 77 L.Ed.2d 469].) Here, the disputed uses were included as minor historical references to plaintiffs within game programs and Web sites and in videos documenting baseball's past, rather than in advertisements selling a product. As such, they are readily distinct from uses that *do no more than propose a commercial transaction.*

*Abdul-Jabbar v. General Motors Corp.* (9th Cir. 1996) 85 F.3d 407 (*Abdul-Jabbar*) relied on by plaintiffs, demonstrates the difference between Baseball's message and a commercial advertisement. In *Abdul-Jabbar,* the plaintiff sued the defendant for using his former name, Lew Alcindor, in a

---

[9]See also *Comedy III, supra,* 25 Cal.4th 387 and *Cardtoons v. Major League Baseball Players* (10th Cir. 1996) 95 F.3d 959, where neither prevailing party was a media business. If plaintiffs' contention was correct, each case could easily have been decided the other way. In fact, each was decided only after extensive consideration of the nature of the expression. The successful party in *Cardtoons* prevailed because its humorous baseball trading cards were deemed a parody of the players' likenesses. The T-shirt seller lost in *Comedy III* because the court concluded he did nothing more than sell a likeness of The Three Stooges on his T-shirts.

commercial broadcast during the 1993 NCAA (National Collegiate Athletic Association) men's basketball tournament. Initially, the commercial asked, "Who holds the record for being voted the most outstanding player of this tournament?" The plaintiff's name and the three years he received the award were then printed on the screen. The commercial then informed the viewer that the "Oldsmobile Eighty-Eight" had made the "Consumer Digest's Best Buy" list "three years in a row." In addition to suing for false endorsement, the plaintiff alleged violations of his common law and statutory rights to publicity. (*Id.* at pp. 409-410.) In its reversal of the trial court's grant of summary judgment for the defendant, the Ninth Circuit Court of Appeals reinstated the plaintiff's right of publicity claims against the defendant due to the unconsented use of his sports statistics in an *advertisement.* "While Lew Alcindor's basketball record may be said to be 'newsworthy,' its use is not automatically privileged. [The defendant] used the information in the context of an automobile *advertisement,* not in a news or sports account." (*Id.* at p. 416, italics added.)

Here, plaintiffs never contend that their statistics and depictions appeared in the context of an advertisement. Rather, they state that the information was used to increase interest in baseball, with the belief that this would increase attendance at games. One might question whether the statistics are provided to stimulate interest or simply to respond to the interest already present. Whichever is true, however, the *Abdul-Jabbar* case demonstrates Baseball's uses are not advertisements, nor speech where "the primary message is 'buy.' " (2 McCarthy, The Rights of Publicity and Privacy (2d ed. 2001) § 8.16, pp. 8-21 to 8-22.)

Thus, there is significant public interest in the information conveyed by the challenged uses, and Baseball is not exploiting that interest by inserting the data in an advertisement. Even if Baseball did use the information in such an advertisement, we question whether this would be determinative. A review of the cases finding that commercial speech violates the right of publicity strongly suggests that advertisements are actionable when the plaintiff's identity is used, without consent, to promote an *unrelated* product. (See, e.g., *Newcombe v. Adolf Coors Co.* (9th Cir. 1998) 157 F.3d 686, 691-694 [use of pitcher's image in printed beer advertisement]; *Abdul-Jabbar, supra,* 85 F.3d at p. 416 [use of basketball star's former name in television car commercial]; *Waits v. Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093, 1097-1098 [use of imitation of singer's voice in radio snack food commercial]; *White v. Samsung Electronics America, Inc.* (9th Cir. 1992) 971 F.2d 1395, 1396 [use of game show hostess's "identity" in print advertisements for electronic products]; *Midler v. Ford Motor Co.* (9th Cir. 1988) 849 F.2d 460, 461 [use in television commercial of soundalike rendition of song

recorded by singer]; *Reilly v. Rapperswill Corp.* (1975) 50 A.D.2d 342, 343-344 [377 N.Y.S.2d 488, 489-490] [incorporation of news broadcast concerning energy crisis into promotional film advertising defendant's insulation]; *Flores v. Mosler Safe Company* (1959) 7 N.Y.2d 276, 278-280 [196 N.Y.S.2d 975, 976-977, 164 N.E.2d 853, 853-854] [incorporation of an entire newspaper article about a fire that had mentioned the plaintiff by name into advertisement by safe manufacturer].)

A celebrity's likeness may be used, however, to advertise a *related* product. Courts have consistently held that the news media may use celebrity photographs from current or prior publications as advertisements " 'for the periodical itself, illustrating the quality and content of the periodical without the person's written consent.' [Citation]" (*Montana v. San Jose Mercury News, Inc., supra,* 34 Cal.App.4th at p. 796; see also Rest.3d Unfair Competition, § 47, Use for purposes of Trade, pp. 547-548.) If a video documentary contains an unconsented, though protected, use of a person's likeness, there is little question that an advertisement for the documentary, containing a clip of that use would be permissible. (See *Dora, supra,* 15 Cal.App.4th at p. 544; see also *Cardtoons v. Major League Baseball Players, supra,* 95 F.3d at p. 970 ["Cardtoons trading cards . . . are not commercial speech—they do not merely advertise another *unrelated* product." (Italics added.)].) Thus, even if Baseball used depictions of players playing the game or recited statistics or historical facts about the game to advertise *the game* and promote attendance, the commercial speech cases relied on by plaintiffs would be inapposite.[10] The owner of a product is entitled to show that product to entice customers to buy it.

In addition, this is not a situation where Baseball affixed plaintiffs' names or images to merchandise such as T-shirts, lithographic prints, baseball souvenirs or other tangible products in order to market them to the public. (Cf. *Comedy III, supra,* 25 Cal.4th at p. 395.) Although plaintiffs alleged such activities in their pleadings, they were unable to present any evidence to the trial court of such uses by Baseball.

 The uses at issue are entitled to receive the full constitutional protection accorded to noncommercial speech. Given the significant public interest in this sport, plaintiffs can only prevail if they demonstrate a substantial competing interest. They have not.

---

[10]However, if Baseball used the photograph of a celebrity *attending* a game in a similar advertisement, plaintiffs' commercial speech cases would be more apt. (Cf. 2 McCarthy, The Rights of Publicity and Privacy, *supra,* § 8.10, p. 8-14.)

The right to exploit commercially one's celebrity is primarily an economic right. (*Comedy III, supra,* 25 Cal.4th at p. 403.)[11] The challenged uses involve statements of historical fact, descriptions of these facts or video depictions of them. Plaintiffs never suggest how Baseball's actions impair their economic interests. It appears equally likely that plaintiffs' marketability is enhanced by Baseball's conduct challenged here. Balancing plaintiffs' negligible economic interests against the public's enduring fascination with baseball's past, we conclude that the public interest favoring the free dissemination of information regarding baseball's history far outweighs any proprietary interests at stake. Therefore, the trial court was correct to grant summary adjudication on this cause of action.[12] (Code Civ. Proc., § 437c, subd. (*o*)(2).)

2. *Plaintiffs' Statutory Rights Under Section 3344*

Subdivision (a) of section 3344 states in part: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, . . . without such person's prior consent, . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." Subdivision (d) of section 3344 states: "For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, . . . shall not constitute a use for which consent is required under subdivision (a)."

Here, the trial court found, among other grounds, that the complained of uses of plaintiffs' names, images and likenesses were all "in connection with [a] news, public affairs, or sports account" within the meaning of section 3344, subdivision (d), and as such did not constitute uses for which consent is required under subdivision (a). We agree that these uses come within the "public affairs" exemption to consent provided in subdivision (d).

---

[11]Whether this right, in fact, provides any true incentive for athletes or others to hone their craft is an open question. "[E]ven without the right of publicity the rate of return to stardom in the entertainment and sports fields is probably high enough to bring forth a more than 'adequate' supply of creative effort and achievement." (Madow, *Private Ownership of Public Image: Popular Culture and Publicity Rights* (1993) 81 Cal. L.Rev. 127, 210.)

[12]In light of the foregoing determination, we need not consider the trial court's alternative ground for granting summary adjudication on this cause of action based on plaintiffs' failure to establish their lack of consent by Baseball to the uses of their names and images in dispute. We likewise need not discuss the arguments raised by plaintiffs concerning the statute of limitations, or the court's additional alternative ground applicable to Gionfriddo, that the complained of uses were legally permissible under paragraph 3(c) of the Uniform Players Contract.

In *Dora*, a former "legend" of the surfing subculture sued the producer of a video documentary on surfing, claiming common law and statutory appropriation of his name and likeness. (*Dora, supra,* 15 Cal.App.4th at pp. 540-541.) The court first found that, because the documentary contained matters of public interest protected under the First Amendment, the common law claim failed. (*Id.* at p. 544.) In addressing the claim under section 3344, subdivision (a), the court broadly interpreted the term "public affairs" to "include things that would not necessarily be considered news. . . . [Citation.] We also presume that the term 'public affairs' was intended to mean something less important than news. [Citation.]" (*Dora, supra,* at p. 545.) "[W]e cannot limit the term 'public affairs' to topics that might be covered on public television or public radio. To do so would be to jeopardize society's right to know, because publishers and broadcasters could be sued for use of name and likeness in documentaries on subjects that do not relate to politics or public policy, and may not even be important, but are of interest." (*Id.* at p. 546.) The court then protected the documentary against the statutory claim because of the public's interest in surfing and the sport's influence on popular culture and lifestyle, affecting many facets of contemporary life. (*Ibid.*; see *Montana v. San Jose Mercury News, Inc., supra,* 34 Cal.App.4th at p. 795 [Posters reproducing newspaper accounts of a football team's victories in the Super Bowl are a " 'form of public interest presentation to which protection [under § 3344, subd. (d)] must be extended.' [Citation.].")

In the instant case, Baseball's Web sites, documentaries and game day programs are entitled to the same protection afforded the surfing documentary. We have already determined, when considering plaintiffs' common law claims, that the uses at issue in this case were in the "public interest." We also believe the uses qualify as "public affairs" within the meaning of section 3344, subdivision (d). Baseball, not surfing, is, after all, "the national pastime." In view of baseball's pervasive influence on our culture, we conclude that the types of uses raised in the record before us are among the "public affairs" uses exempt from consent under section 3344, subdivision (d).

Plaintiffs contend that Baseball cannot rely on the exemptions of section 3344, subdivision (d), as a defense because Baseball failed to refer to subdivision (d) in their answer to the complaint. We disagree. Baseball was not required to raise subdivision (d) of section 3344 as a separate affirmative defense. Any facts which tend to disprove one of the allegations raised in a complaint may be offered in the defendant's answer based upon a general denial and need not be raised by affirmative defense. (*Walsh v. West Valley Mission Community College Dist.* (1998) 66 Cal.App.4th 1532, 1546 [78

Cal.Rptr.2d 725].) Here, plaintiffs' second amended complaint alleged a separate cause of action claiming violation of the statutory right of publicity under section 3344. This placed in issue the entirety of section 3344, including the uses exempted from the consent requirement by subdivision (d). Throughout this litigation plaintiffs have borne the burden of establishing that their names and likenesses were used in violation of section 3344, and this burden has always required proof that the disputed uses fell outside the exemptions granted by subdivision (d). Baseball having generally denied violation of section 3344, plaintiffs were placed on notice of the need to prove all the elements of their claim. Accordingly, plaintiffs have no legitimate basis to claim surprise that Baseball's motion raised defenses based upon subdivision (d).

The uses challenged by plaintiffs fell within the exemptions set forth in Civil Code section 3344, subdivision (d), and as such do not constitute uses for which consent was required under subdivision (a). The trial court was correct to grant summary adjudication of the statutory right of publicity claim since plaintiffs were unable to establish all of the elements necessary to prove a violation within the ambit of Civil Code section 3344, subdivision (a). (Code Civ. Proc., § 437c, subd. (*o*)(2).)[13]

3. *The Declaratory Relief Causes of Action**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II*

### APPEAL NO. A091113: THE SAN FRANCISCO ACTION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgments are affirmed. Defendants shall recover their costs for both appeals.

Jones, P. J., and Stevens, J., concurred.

The petition of all appellants for review by the Supreme Court was denied March 27, 2002. Chin, J., did not participate therein.

---

[13]See footnote 12, *ante*, page 414.
*See footnote, *ante*, page 400.