Dustin HOFFMAN, Plaintiff–Appellee,

v.

CAPITAL CITIES/ABC,
INCORPORATED,
Defendant,

and

L.A. Magazine, Inc., Defendant–
Appellant.

Nos. 99–55563, 99–55686.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 10, 2000.

Filed July 6, 2001.

Steven M. Perry, Munger, Tolles & Olson, Los Angeles, California, for the defendant-appellant.

Charles N. Shephard, Greenberg Glusker Fields Claman & Machtinger, Los Angeles, California, for the plaintiff-appellee.

Mark S. Lee, Manatt, Phelps & Phillips, Los Angeles, California, for amicus curiae Elvis Presley Enterprises, Inc.

Floyd Abrams and Landis C. Best, Cahill Gordon & Reindel, New York, New York, for amici curiae of Various Magazine and Newspaper Publishers, Broadcasters, Television Syndicators, and Media Associations.

Before: BOOCHEVER, TASHIMA, and TALLMAN, Circuit Judges.

BOOCHEVER, Circuit Judge:

In 1982, actor Dustin Hoffman starred in the movie "Tootsie," playing a male actor who dresses as a woman to get a part on a television soap opera. One memorable still photograph from the movie showed Hoffman in character in a red long-sleeved sequined evening dress and high heels, posing in front of an American flag. The still carried the text, "What do you get when you cross a hopelessly straight, starving actor with a dynamite

red sequined dress? You get America's hottest new actress."

In March 1997, Los Angeles Magazine ("LAM") published the "Fabulous Hollywood Issue!" An article from this issue entitled "Grand Illusions" used computer technology to alter famous film stills to make it appear that the actors were wearing Spring 1997 fashions. The sixteen familiar scenes included movies and actors such as "North by Northwest" (Cary Grant), "Saturday Night Fever" (John Travolta), "Rear Window" (Grace Kelly and Jimmy Stewart), "Gone with the Wind" (Vivian Leigh and Hattie McDaniel), "Jailhouse Rock" (Elvis Presley), "The Seven Year Itch" (Marilyn Monroe), "Thelma and Louise" (Susan Sarandon and Geena Davis), and even "The Creature from the Black Lagoon" (with the Creature in Nike shoes). The final shot was the "Tootsie" still. The American flag and Hoffman's head remained as they appeared in the original, but Hoffman's body and his long-sleeved red sequined dress were replaced by the body of a male model in the same pose, wearing a spaghetti-strapped, cream-colored, silk evening dress and high-heeled sandals. LAM omitted the original caption. The text on the page identified the still as from the movie "Tootsie," and read, "Dustin Hoffman isn't a drag in a butter-colored silk gown by Richard Tyler and Ralph Lauren heels."

LAM did not ask Hoffman for permission to publish the altered photograph. Nor did LAM secure permission from Columbia Pictures, the copyright holder. In April 1997, Hoffman filed a complaint in California state court against LAM's parent company, Capital Cities/ABC, Inc. (now ABC, Inc. or "ABC"). The complaint alleged that LAM's publication of the altered photograph misappropriated Hoffman's name and likeness in violation of (1) the California common law right of publicity; (2) the California statutory right of publicity, Civil Code § 3344; (3) the California unfair competition statute, Business and Professions Code § 17200; and (4) the federal Lanham Act, 15 U.S.C. § 1125(a).

ABC removed the case to federal court. Hoffman added LAM as a defendant. After a bench trial, the district court found for Hoffman and against LAM on all of Hoffman's claims, rejecting LAM's defense that its use of the photograph was protected by the First Amendment. The court awarded Hoffman $1,500,000 in compensatory damages, and held that Hoffman was entitled to punitive damages as well. *Hoffman v. Capital Cities/ABC, Inc.*, 33 F.Supp.2d 867 (C.D.Cal.1999). After a hearing, the court awarded Hoffman $1,500,000 in punitive damages. It also held that ABC was not liable for any of LAM's actions.

Hoffman moved for an award of $415,755.41 in attorney fees. The district court granted the motion, but reduced the amount to $269,528.50.

In these appeals, LAM appeals the district court's judgment in Hoffman's favor, and the court's award of attorney fees.

## ANALYSIS

■ California recognizes, in its common law and its statutes, "the right of a person whose identity has commercial value-most often a celebrity-to control the commercial use of that identity." *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1098 (9th Cir.1992) (as amended). Hoffman claims that LAM violated his state right of publicity by appropriating his name and likeness. He also claims that LAM violated his rights under the federal Lanham Act.

■ LAM replies that its challenged use of the "Tootsie" photo is protected under the First Amendment. We evaluate this defense aware of "the careful balance that courts have gradually constructed between

the right of publicity and the First Amendment and federal intellectual property laws." *Landham v. Lewis Galoob Toys, Inc.,* 227 F.3d 619, 626 (6th Cir.2000).

■ LAM argues that the "Grand Illusions" article and the altered "Tootsie" photograph contained therein are an expression of editorial opinion, entitled to protection under the First Amendment. Hoffman, a public figure,[1] must therefore show that LAM, a media defendant, acted with "actual malice," that is, with knowledge that the photograph was false, or with reckless disregard for its falsity. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Because Hoffman did not produce clear and convincing evidence that LAM acted with actual malice, LAM contends that all Hoffman's claims are barred by the First Amendment.

The district court rejected this argument. First, it concluded that the magazine article was commercial speech not entitled to constitutional protection: "[t]he First Amendment does not protect the exploitative commercial use of Mr. Hoffman's name and likeness." *Hoffman,* 33 F.Supp.2d at 874. Second, the court found that LAM acted with actual malice, and "the First Amendment does not protect knowingly false speech." *Id.* at 875.[2]

1. Hoffman does not contest that he is a public figure. In fact, Hoffman alleges that he is a readily-identifiable individual whose persona has commercial value under his right of publicity claim.

2. In *Comedy III Prods., Inc. v. Gary Saderup, Inc.,* 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797 (2001), the California Supreme Court held that there was no First Amendment defense to a California right of publicity claim when "artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain." *Id.* at 808. An artist who added "significant transformative elements" could still invoke First Amendment protection. *Id.*

*Commercial speech*

The district court concluded that LAM's alteration of the "Tootsie" photograph was an "exploitative commercial" use not entitled to First Amendment protection. We disagree.

■ "Commercial speech" has special meaning in the First Amendment context. Although the boundary between commercial and noncommercial speech has yet to be clearly delineated, the "core notion of commercial speech" is that it "does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (quotations omitted). Such speech is entitled to a measure of First Amendment protection. *See, e.g., Greater New Orleans Broad. Ass'n, Inc. v. United States,* 527 U.S. 173, 183, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (setting out four-part test to evaluate constitutionality of governmental regulation of "speech that is commercial in nature"). Commercial messages, however, do not receive the same level of constitutional protection as other types of protected expression. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 498, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). False or misleading commercial speech is not protected. *See Florida Bar v. Went For It, Inc.,* 515 U.S. 618,

Even if we were to consider LAM an "artist" and the altered "Tootsie" photograph "artistic expression" subject to the *Comedy III* decision, there is no question that LAM's publication of the "Tootsie" photograph contained "significant transformative elements." Hoffman's body was eliminated and a new, differently clothed body was substituted in its place. In fact, the entire theory of Hoffman's case rests on his allegation that the photograph is not a "true" or "literal" depiction of him, but a false portrayal. Regardless of the scope of *Comedy III,* it is clear to us that it does not strip LAM of First Amendment protection.

623–24, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (commercial speech receives limited amount of protection compared to speech at core of First Amendment and may freely be regulated if it is misleading). When speech is properly classified as commercial, a public figure plaintiff does not have to show that the speaker acted with actual malice. *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 556 (5th Cir.2001) ("Supreme Court precedent prevents us from importing the actual-malice standard into cases involving false commercial speech.").

■ In many right of publicity cases, the question of actual malice does not arise, because the challenged use of the celebrity's identity occurs in an advertisement that "does no more than propose a commercial transaction" and is clearly commercial speech. *See, e.g., Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691 (9th Cir.1998) (use of pitcher's image in printed beer advertisement); *Abdul–Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 409 (9th Cir.1996) (use of basketball star's former name in television car commercial); *Waits*, 978 F.2d at 1097–98 (use of imitation of singer's voice in radio snack-food commercial); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1396 (9th Cir.1992) (as amended) (use of game-show hostess's "identity" in print advertisements for electronic products); *Midler v. Ford Motor Co.*, 849 F.2d 460, 461 (9th Cir.1988) (use in television car commercial of "sound-alike" rendition of song singer had recorded). In all these cases, the defendant used an aspect of the celebrity's identity entirely and directly for the purpose of selling a product. Such uses do not implicate the First Amendment's protection of expressions of editorial opinion. *Cf. White*, 971 F.2d at 1401 (advertisement in which "spoof" is entirely subservient to primary message to "buy" identified product not protected by First Amendment).

Hoffman points out that the body double in the "Tootsie" photograph was identified as wearing Ralph Lauren shoes and that there was a Ralph Lauren advertisement (which does not feature shoes) elsewhere in the magazine. (Insofar as the record shows, Richard Tyler, the designer of the gown, had never advertised in LAM.) Hoffman also points to the "Shopper's Guide" in the back of the magazine, which provided stores and prices for the shoes and gown.

■ These facts are not enough to make the "Tootsie" photograph pure commercial speech. If the altered photograph had appeared in a Ralph Lauren advertisement, then we would be facing a case much like those cited above. But LAM did not use Hoffman's image in a traditional advertisement printed merely for the purpose of selling a particular product. Insofar as the record shows, LAM did not receive any consideration from the designers for featuring their clothing in the fashion article containing the altered movie stills. Nor did the article simply advance a commercial message. "Grand Illusions" appears as a feature article on the cover of the magazine and in the table of contents. It is a complement to and a part of the issue's focus on Hollywood past and present. Viewed in context, the article as a whole is a combination of fashion photography, humor, and visual and verbal editorial comment on classic films and famous actors. Any commercial aspects are "inextricably entwined" with expressive elements, and so they cannot be separated out "from the fully protected whole." *Gaudiya Vaishnava Soc'y v. City & County of San Francisco*, 952 F.2d 1059, 1064 (9th Cir.1990) (as amended); *see Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). "[T]here are commonsense differences between speech that does no more than pro-

pose a commercial transaction and other varieties," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (quotations and citation omitted), and common sense tells us this is not a simple advertisement.

■ The district court also concluded that the article was not protected speech because it was created to "attract attention." 33 F.Supp.2d at 874. A printed article meant to draw attention to the for-profit magazine in which it appears, however, does not fall outside of the protection of the First Amendment because it may help to sell copies. *Cf. Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1197–98 (9th Cir.1989) (although defendant may have published feature solely or primarily to increase circulation and therefore profits, article is not thereby purely commercial or for purposes of advertising); *Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 895 (9th Cir.1988) (same). While there was testimony that the Hollywood issue and the use of celebrities was intended in part to "rev up" the magazine's profile, that does not make the fashion article a purely "commercial" form of expression.

We conclude that LAM's publication of the altered "Tootsie" photograph was not commercial speech.

*Actual malice*

The district court went on to state that even if LAM could raise a First Amendment defense, LAM acted with actual malice, and "the First Amendment does not protect knowingly false speech," 33 F.Supp.2d at 875 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). The court found that the magazine altered Hoffman's image, and then published that image knowing it was false and intending that the readers believe the falsehood:

[LAM] knew that Mr. Hoffman had never worn the designer clothes he was depicted as wearing, and that what they were showing was not even his body. Moreover, [LAM] admitted that it intended to create the false impression in the minds of the public "that they were seeing Mr. Hoffman's body."

*Id.*

■ We have concluded that LAM is entitled to the full First Amendment protection accorded noncommercial speech. Because a public figure such as Hoffman can recover damages for noncommercial speech from a media organization such as LAM only by proving "actual malice," we now must determine whether the district court was correct in concluding that LAM acted with "reckless disregard for the truth" or a "high degree of awareness of probable falsity." *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (quotations omitted).

■ We review the district court's finding of actual malice de novo. *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir.1997) ("First Amendment questions of constitutional fact compel us to conduct a de novo review. We ourselves must be convinced that the defendant acted with malice.") (quotations, alterations, and citation omitted); *see Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 508 n. 27, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). We give to "credibility determinations the special deference to which they are entitled," and then "determine whether the believed evidence establishes actual malice." *Eastwood*, 123 F.3d at 1252. We must "satisfy ourselves that plaintiff proved malice by clear and convincing evidence, which we have described as a heavy burden, far in excess of the preponderance sufficient for

most civil litigation." *Id.* (citations and quotations omitted).

We must first identify the purported false statement of fact in issue. Hoffman alleged, and the district court found, that the altered "Tootsie" photograph and the accompanying text were "false" because they created the impression that Hoffman himself posed for the altered photograph (that is, that Hoffman was wearing the Richard Tyler dress and the Ralph Lauren shoes which replaced the red sequined dress and the shoes Hoffman wore in the original photograph). To show actual malice, Hoffman must demonstrate by clear and convincing evidence that LAM intended to create the false impression in the minds of its readers that when they saw the altered "Tootsie" photograph they were seeing Hoffman's body. *See id.* It is not enough to show that LAM unknowingly misled readers into thinking Hoffman had actually posed for the altered photograph. Mere negligence is not enough to demonstrate actual malice. *Dodds v. American Broad. Co.,* 145 F.3d 1053, 1063 (9th Cir.1998) (citing *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)). "[S]ubjective or actual intent is required and ... 'there is no actual malice where journalists unknowingly mislead the public.'" *Id.* at 1064 (quoting *Eastwood,* 123 F.3d at 1256). The evidence must clearly and convincingly demonstrate that LAM knew (or purposefully avoided knowing) that the photograph would mislead its readers into thinking that the body in the altered photograph was Hoffman's. *See Eastwood,* 123 F.3d at 1256.

The altered photograph retains Hoffman's head and the American flag background from the "Tootsie" still, but grafts onto it a body dressed in different clothing. The body is similar in appearance to Hoffman's in the original. On the page directly facing the altered "Tootsie" photograph the magazine printed small copies of all sixteen original, unaltered stills, including the original "Tootsie" photograph. By providing a point of comparison to the original, this next page made it clear that LAM had altered the film still. This direct comparison does not, however, alert the reader that Hoffman did not participate in the alteration.

We must go beyond the altered photograph itself and examine the "totality of [LAM's] presentation," to determine whether it "would inform the average reader (or the average browser)" that the altered "Tootsie" photograph was not a photograph of Hoffman's body. *See id.* The article is featured on the magazine cover as "The Ultimate Fashion Show Starring Grace Kelly, Marilyn Monroe and Darth Vader." The table of contents describes the "Grand Illusions" article: "By using state-of-the-art digital magic, we clothed some of cinema's most enduring icons in fashions by the hottest designers." The accompanying full-page photo is of Humphrey Bogart and Ingrid Bergman as they appeared in "Casablanca," wearing current designer clothing, with a caption stating, "Digital composite by ZZYZX."

A few pages later, the "editor's note" describes the article:

> The movie stills in our refashioned fashion spectacular, "Grand Illusions" (page 104) *have* appeared before-in fact, they're some of the most famous images in Hollywood history. But you've never seen them quite like this. Cary Grant, for example, is still ducking that pesky plane in *North by Northwest,* but now he is doing it as a runway model, wearing a suit from Moschino's spring collection. We know purists will be upset, but who could resist the opportunity to produce a 1997 fashion show with mannequins who have such classic looks?

The Contributors page states: " 'With computers,' says Elisabeth Cotter of ZZYZX, 'you can transform anything-even the past.' She proved it by using the latest in computer software to give old movie stars makeovers for 'Grand Illusions.' "

The "Grand Illusions" article itself states on the title page, "With the help of digital magic and today's hottest designers, we present the ultimate Hollywood fashion show—starring Cary Grant, Marilyn Monroe, Rita Hayworth and the Creature from the Black Lagoon. Photographs by Alberto Tolot. Digital Composites by ZZYZX." Each photograph that follows identifies the actor whose "body" is clothed in designer clothing with a reference to the featured film. Representative captions read "Cary Grant is dashing in . . . ." (as he runs from the cropduster in "North by Northwest"), "Harold Lloyd looks timely in . . . ." (as he hangs from the clock in "Safety Last"), "Marilyn Monroe cools off in . . . ." (as she stands on the grate in "The Seven Year Itch"), "Jimmy Stewart likes to watch in . . . ." (as he looks at Grace Kelly in "Rear Window"), "Susan Sarandon takes on mankind in . . . ." (as she aims a gun in "Thelma and Louise"), and "Judy Garland hits the bricks in . . . ." (as she runs through a field in "The Wizard of Oz" with the Cowardly Lion, the Tin Man, and the Scarecrow, "who is stuffed into" a designer suit printed with bricks). Finally, the "Tootsie" photograph appears, with its caption "Dustin Hoffman isn't a drag in a butter-colored silk gown by Richard Tyler and Ralph Lauren heels," immediately followed by the page showing all the original stills. The only remaining reference to the article is the "shopping guide," which, almost twenty pages later, provides prices and the names of stores carrying some of the clothing featured in the photographs.

██ We do not believe that the totality of LAM's presentation of the article and the "Tootsie" photograph provides clear and convincing evidence that the editors intended to suggest falsely to the ordinary reader that he or she was seeing Hoffman's body in the altered "Tootsie" photograph. All but one of the references to the article in the magazine make it clear that digital techniques were used to substitute current fashions for the clothes worn in the original stills. Although nowhere does the magazine state that models' bodies were digitally substituted for the actors' bodies, this would be abundantly clear given that the vast majority of the featured actors were deceased. While LAM never explicitly told its readers that the living actors did not pose for the altered photographs in the article, there is certainly no clear and convincing evidence in the magazine itself that LAM intended to suggest the opposite—that it convinced Hoffman (or, for that matter, John Travolta, Elizabeth Taylor, Susan Sarandon, and Geena Davis) to recreate poses from their past roles for this fashion article.

The district court stated that LAM "admitted that it intended to create the false impression in the minds of the public 'that they were seeing Mr. Hoffman's body.' " This is a quotation from a portion of the style editor's testimony, in which she explained that she wanted the male model whose body would appear in the altered "Tootsie" photograph to have Hoffman's body type. She later explained, however, that she did not intend to convey to readers that Hoffman had participated in some way in the article's preparation, and never thought that readers would believe Hoffman posed for the photograph in the new dress.

██ We defer to the district court when it makes a credibility determination. *See Eastwood*, 123 F.3d at 1252. In this

case, the district court made no express credibility finding, as it did not state that it believed this one statement and disbelieved the remainder of the editor's testimony. But even if the district court had determined that only this quoted portion of her testimony were worthy of belief, it does not constitute clear and convincing evidence that LAM intended to *mislead* its readers. This single statement, whose meaning is ambiguous in the context of other testimony, the text of the article, and the entire magazine, is not sufficient to strip the magazine of its First Amendment protection. *See Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 671 (9th Cir.1990) (as amended) (in evaluating claims of actual malice, "even when we accord credibility determinations the special deference to which they are entitled, we must nevertheless examine for ourselves the factual record in full") (quotations omitted).[3]

We conclude that LAM is entitled to the full First Amendment protection awarded noncommercial speech. We also conclude that Hoffman did not show by clear and convincing evidence, which is "far in excess of the preponderance sufficient for most civil litigation," *Eastwood,* 123 F.3d at 1252, that LAM acted with actual malice in publishing the altered "Tootsie" photograph. Because there is no clear and convincing evidence of actual malice, we must reverse the district court's judgment in Hoffman's favor and the court's award of

attorney fees to Hoffman, and direct that judgment be entered for LAM.[4]

REVERSED.

---

**3.** Hoffman also argues that the photograph created the false implication that he approved the use of his name and likeness in the altered photograph or that he was somehow associated with the designers. The district court did not address this claim in making its determination that LAM acted with actual malice. At any rate, Hoffman does not explain how the evidence or testimony shows that LAM subjectively intended that the reader believe Hoffman had endorsed the use of his name or

likeness or the selection of the clothes, and we see no clear and convincing evidence of such intent.

**4.** Because we conclude that the First Amendment protects LAM's use of the "Tootsie" photograph, we need not address LAM's argument that Hoffman's state law claims are preempted by the federal Copyright Act, 17 U.S.C. § 301.