**General Charles E. "Chuck" YEAGER (Ret.), Plaintiff,**

v.

**CINGULAR WIRELESS LLC; Bellsouth; SBC Communications; American Telephone & Telegraph; and Does 1 to 200, inclusive, Defendants.**

No. 2:07–cv–02517 FCD GGH.

United States District Court, E.D. California.

Dec. 7, 2009.

Steven E. McDonald, De La Pena & McDonald LLP, San Francisco, CA, for Plaintiff.

Andrew W. Stroud, Stephen Lau, Mennemeier Glassman and Stroud, Sacramento, CA, O. Yale Lewis–PHV, Jr., Whitney I. Furman–PHV, Hendricks and Lewis, Seattle, WA, for Defendants.

### MEMORANDUM AND ORDER

FRANK C. DAMRELL, JR., District Judge.

This matter comes before the court on defendant AT & T Mobility, LLC's ("AT & T" or "defendant")[1] motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff General Charles E. "Chuck" Yeager ("Yeager" or "plaintiff") opposes the motion. For the reasons set forth herein,[2] defendant's motion for summary judgment is DENIED.

### BACKGROUND [3]

This case arises out of the use of plaintiff's name in a publication issued by Cingular Wireless entitled "Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season" (the "Publication").[4] (UMF ¶ 1.) Plaintiff Yeager served in the United States Army Air Corps for many years. (Dep. of General Charles "Chuck" Yeager ("Yeager Dep."), Ex. B to Decl. of Steven E. McDonald ("McDonald Decl.") [Docket

---

**1.** On March 27, 2008, pursuant to the parties' stipulation, the court ordered that AT & T Mobility LLC be substituted as defendant. All other named defendants were dismissed without prejudice. (Stip. & Order [Docket # 12], filed Mar. 27, 2008.)

**2.** Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. *See* E.D. Cal. L.R. 78–230(h).

**3.** Unless otherwise noted, the facts herein are undisputed. (*See* Pl.'s Response to Def.'s Separate Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("UMF") [Docket # 56], filed Oct. 13, 2009, at 1–8.) Where the facts are disputed, the court recounts plaintiff's version of the facts. (*See* Pl.'s Statement of Disputed Facts ("DF") [Docket # 56], filed Oct. 13, 2009, at 8–12.)

**4.** The complaint alleges that defendant Cingular Wireless LLC issued the material, but the Stipulation and Order was based upon express representations that defendant At & T was responsible for the Publication. (Stip. & Order [Docket # 12].)

# 57], filed Oct. 13, 2009, at 13.) He was trained to be a combat pilot and a test pilot after enlisting at the age of eighteen. (*Id.*) On October 14, 1947, as part of the mission of the United States Air Force to try to break the sound barrier, Yeager was the first pilot to exceed the speed of sound. (*Id.* at 17–18.)

The Publication at issue was released on May 17, 2006 through PR Newswire and posted on Cingular's website. (UMF ¶ 2.) The Publication is 755 words long and contains information about Cingular's preparedness for disasters, such as hurricanes, through its emergency preparedness equipment that includes its MACH1 and MACH2 mobile command centers. (UMF ¶¶ 3, 15.) In the fifth paragraph, the Publication also provides:

> "Nearly 60 years ago, the legendary test pilot Chuck Yeager broke the sound barrier and achieved Mach 1. Today, Cingular is breaking another kind of barrier with our MACH 1 and MACH 2 mobile command centers, which will enable us to respond rapidly to hurricanes and minimize their impact on our customers," de la Vega said.

(UMF ¶ 4.)

The Publication neither includes a picture of plaintiff nor mentions plaintiff's name in any headline or headings. (UMF ¶¶ 7–8.) It does not propose a commercial transaction, nor does it offer for sale any specific products or services. (UMF ¶ 8.) The Publication also does not state that plaintiff endorses or has enjoyed benefits from Cingular, AT & T, or any of their products or services. (UMF ¶¶ 10–11.)

The executive director of media relations for AT & T Mobility who wrote the Publication, Mark Siegel ("Siegel"), testified that the purpose of the press release was "two-fold". (DF ¶ 5; Dep. of Mark Siegel ("Siegel Dep.") at 16:18.) First, AT & T sought to demonstrate its commitment "to improve our efforts to restore services as quickly as possible after a natural disaster." (Siegel Dep. at 16:18–21.) Second, it sought "to create positive associations in people's mind with the AT & T brand so they would think highly of the company." (*Id.* at 16:22–23.) Siegel noted the connection between MACH, the acronym for defendant's technology, and MACH, the sound barrier; he crafted the Publication to make an association between breaking the sound barrier and breaking new barriers of disaster preparedness. (*Id.* at 18:12–17; DF ¶ 8.) Plaintiff contends that AT & T used his name within the Publication in order capitalize upon his name, reputation, and iconic image. Plaintiff further asserts that his name was used as a "hook" to entice an audience to read about defendant's improved services. (*See* DF ¶¶ 6–7, 11; Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Opp'n"), filed Oct. 13, 2009, at 3.)

Plaintiff brings claims for (1) violation of California common law right to privacy/right to control publicity and likeness (also known as a common law claim for commercial misappropriation); (2) violation of California Civil Code § 3344; (3) violation of the Lanham Act, 15 U.S.C. § 1125(a); (4) unjust enrichment; (5) violation of California Business and Professions Code § 17200; and (6) violation of California False Advertising Act. (Compl., filed Nov. 21, 2007.) Defendant seeks summary judgment against plaintiff on all claims for relief.[5]

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show

---

**5.** Plaintiff filed a supplemental opposition to which defendant objects. The court considers neither plaintiff's supplemental opposition nor defendant's response thereto.

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in the light most favorable to the nonmoving party. *See Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *See Nissan Fire & Marine,* 210 F.3d at 1107. Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

**ANALYSIS**

**A. Common Law and Statutory Claims for Misappropriation**

 Plaintiff claims that defendant violated his rights to control the use of his name and identity because defendant made unauthorized use of plaintiff's name to promote defendant's unrelated products and services. (Pl.'s Opp'n Mot. Summ. J. ("Pl.'s Opp'n"), filed Oct. 13, 2009, at 9.) "California recognizes, in its common law and its statutes, 'the right of a person whose identity has commercial value-most often a celebrity-to control the commercial use of that identity.'" *Hoffman v. Capital Cities/ABC, Inc.,* 255 F.3d 1180, 1184 (9th Cir.2001) (quoting *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1098 (9th Cir.1992)). To state a claim for misappropriation of likeness under common law, a plaintiff must prove: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1001 (9th Cir.2001) (citing *Eastwood v. Superior Court,* 149 Cal.App.3d 409, 417, 198 Cal.Rptr. 342 (1983)). Section 3344 of the California Civil Code complements the common law cause of action for commercial misappropriation. *See Abdul–Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 414 (9th Cir.1996). A plaintiff making a claim under Section 3344 must "allege a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose," in addition to proving the elements of the common law cause of action.[6] *Downing,* 265 F.3d at 1001.

**6.** California Civil Code § 3344(a) provides in relevant part that "[a]ny person who knowingly uses another's name ... in any manner ... for purposes of advertising or selling, or soliciting purchases of ... goods or services, without such person's prior consent ... shall be liable for any damages sustained by the person or persons injured as a result thereof."

Defendant argues that summary judgment should be granted as to both plaintiff's common law and statutory claims based upon the applicability of two affirmative defenses, arguing that (1) the First Amendment protects the Publication because it contains newsworthy matter and is not commercial speech; and (2) the doctrine of incidental use protects the "fleeting and inconsequential" use of plaintiff's name. (Def.'s Mem. Mot. Summ. J. ("Def.'s Mem."), filed Oct. 1, 2009.)

### 1. The First Amendment Defense

■■■ "Under both the common law cause of action and the statutory cause of action, 'no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'" *Downing,* 265 F.3d at 1001 (quoting *Montana v. San Jose Mercury News,* 34 Cal.App.4th 790, 793, 40 Cal.Rptr.2d 639 (1995)). "The First Amendment requires that the right to be protected from unauthorized publicity 'be balanced against the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press.'" *Gionfriddo v. Major League Baseball,* 94 Cal.App.4th 400, 409, 114 Cal.Rptr.2d 307 (1st Dist.2001) (quoting *Gill v. Hearst Publ'g Co.,* 40 Cal.2d 224, 228, 253 P.2d 441 (1953)); *Downing,* 265 F.3d at 1001 (noting that the court "must find a proper accommodation between the competing concerns of freedom of speech and the right of publicity"). In order to balance these countervailing interests, a court must consider "the nature of the precise information conveyed and the context of the communication." *Id.* at 410, 114 Cal.Rptr.2d 307.

■■■ The First Amendment defense extends to publications about people "who, by their accomplishments, ... create a legitimate and widespread attention to their activities." *Eastwood v. Superior Court,* 149 Cal.App.3d 409, 422, 198 Cal. Rptr. 342 (1983). Nevertheless, "this defense is not absolute." *Downing,* 265 F.3d at 1001. A tenuous connection between the unauthorized use of a person's name or likeness and the matter of public interest can remove the publication from the First Amendment's protection. *See id.* at 1002. Moreover, if the speech is classified as commercial speech, it is not actionable "when the plaintiff's identity is used, without consent, to promote an unrelated product." *Gionfriddo v. Major League Baseball,* 94 Cal.App.4th 400, 413, 114 Cal. Rptr.2d 307 (2001); *Hoffman,* 255 F.3d at 1185 (noting that when a defendant uses "an aspect of the celebrity's identity entirely and directly for the purpose of selling a product," such use does not "implicate the First Amendment's protection of expressions of editorial opinion").

### a. Commercial Speech

■■■ Defendant argues that the Publication is noncommercial speech that deserves the full protection of the First Amendment. (Def.'s Mem. at 10–11.) Specifically, defendant contends it is undisputed that the Publication does not propose any commercial transactions and does not offer any products or services. (*Id.*)

The "core notion" of commercial speech is that it "does not more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Co.,* 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (citations and quotations omitted); *see Hoffman,* 255 F.3d at 1184. However, the "boundary between commercial and noncommercial speech has yet to be clearly delineated." *Hoffman,* 255 F.3d at 1184. On one end of the spectrum, an advertisement is "clearly commercial speech." *Id.* at 1185; *see e.g. Abdul–Jabbar,* 85 F.3d at

409; *Waits*, 978 F.2d at 1097–98. On the other end of the spectrum is speech that, when viewed as a whole, expresses editorial comment on matters of interest to the public. *See Hoffman*, 255 F.3d at 1185 (holding that magazine article that used an altered photograph of a male celebrity to showcase a designer gown was noncommercial speech because the article did not have the sole purpose of selling a particular product, complemented the magazine issue's focus on Hollywood part and present, and combined fashion photography, humor, and visual and verbal editorial comment); *Montana*, 34 Cal.App.4th at 793–95, 40 Cal.Rptr.2d 639 (holding that relatively contemporaneous reprinting of poster of football player that appeared in newspaper article about Super Bowl victory received full protection under the First Amendment).

Informational publications that refer to or promote a specific product, but are not mere proposals to engage in commercial transactions, present a closer question regarding the appropriate classification of the type of speech. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). In *Bolger*, the court considered whether the plaintiff's informational pamphlet was commercial or noncommercial speech in order to determined the extent of First Amendment Protection. *Id.* The eight page pamphlet, entitled "Plain Talk about Venereal Disease," provided information regarding the prevention of venereal diseases and repeatedly discussed the advantages of using condoms without any specific reference to those manufactured by the plaintiff. *Id.* at 62 n. 4, 66 n. 13, 103 S.Ct. 2875. The single reference to the plaintiff's specific product was at the very bottom of the last page, which stated that the pamphlet was contributed as a public service by the plaintiff, who distributed condoms. *Id.* The Court noted that the pamphlet contained discussions of important public issues. *Id.* at 67, 103 S.Ct. 2875. However, the Court also made clear that "advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech." *Id.* at 68, 103 S.Ct. 2875 (quoting *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 n. 5, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). Based upon the totality of the characteristics of the pamphlet, namely that the plaintiff had an economic motive in mailing the pamphlets, it was conceded to be an advertisement, and it referenced a specific product, the Court held that the pamphlet was properly characterized as commercial speech. *Id.*

In this case, looking at all of its characteristics, the Publication is properly categorized as commercial speech. The central theme of the Publication is how defendant's emergency preparedness program enhances its wireless services. Defendant's name as a service provider is mentioned multiple times throughout the Publication. Further, the Publication did not seek to inform the reader about emergency preparedness generally, but rather how defendant's wireless service specifically had been improved to handle such emergencies. Indeed, the writer of the Publication testified that the purpose of the Publication was, in part, to create positive associations with the AT & T brand. (*See* Siegel Deposition 16:18–23.) As such, it is reasonable to infer that defendant had an economic motivation underlying the Publication's distribution. Further, defendant's name as a service provider is mentioned multiple times throughout the Publication. While none of these facts alone is necessarily dispositive, a review of the Publication as a whole supports a finding that it is commercial speech.

The facts of the case are similar to those the Court found dispositive in *Bolger*, 463 U.S. 60, 103 S.Ct. 2875. In both cases, the speech did not directly propose any commercial transactions or offer any products or services. *See id.* at 62 n. 4, 103 S.Ct. 2875. Rather, the material emphasized the benefits of defendant's product generally. *See id.* Further, in this case, defendant's service was explicitly referred to throughout the body of the writing, while in *Bolger*, the distributor's specific product was referenced only once at the end of the pamphlet. *See id.* Accordingly, even though both the Publication in this case and the pamphlet in *Bolger* contained discussions of important public issues, because the Court concluded the content of the pamphlet supported a finding of commercial speech, the content of the Publication similarly supports such a finding.

Defendant argues that, similar to *Hoffman*, the commercial aspects of the Publication are intertwined with expressive aspects, thus protecting the Publication as a whole as noncommercial speech. (Def.'s Mem. at 11.) However, the facts before the court in *Hoffman* are distinguishable from the facts before the court in this case. At issue in *Hoffman* was a feature article in a magazine that complemented the issue's focus on the history of Hollywood. *Hoffman*, 255 F.3d at 1185. Viewing the article in context, the *Hoffman* court described it as a combination of fashion photography, humor, and visual and verbal editorial comment, implicating the First Amendment's protection of expressions of editorial opinion. *Id.* The *Hoffman* court also noted that the defendant received no consideration from the designers for featuring the clothing in the altered photograph. *Id.* at 1185. Under these facts, the use of the altered photograph as an illustration in the article constituted protected noncommercial use. *Id.* at 1186. In this case, however, the Publication's sole purpose was to promote defendant's services. It provided information about defendant's program, but expressed no editorial comment on public safety issues during a natural disaster or any other related issue. Accordingly, the First Amendment's protection of expressions of editorial opinion is not likewise implicated under the facts in this case. *See Downing*, 265 F.3d at 1003 n. 2 (distinguishing from *Hoffman* because the defendant used plaintiffs' names and photographs to promote its products while the magazine in *Hoffman* was unconnected to and received no consideration for showcasing the designer dress).

Therefore, the court concludes that the Publication at issue is commercial speech for purposes of the First Amendment defense.

### b. Newsworthiness

▮ Defendant also argues that the First Amendment protects the Publication's use of plaintiff's name because the Publication reported on matters of public interest. (Def.'s Mem. at 9.) Specifically, defendant argues that the Publication was issued subsequent to the devastation wrought by Hurricane Katrina, Hurricane Wilma, and Hurricane Rita.[7] Defendant characterizes the information in the Publication as information addressing public safety concerns and whether its customers can continue to rely on defendant's services during a natural disaster. Plaintiff contends that defendant's Publication was not issued solely to convey information of public interest, but rather, "was directed for a profit commercial enterprise." (Opp'n at 3.)

---

**7.** The court notes, however, that the Publication contains no editorial expression related to the specified hurricanes.

Where a plaintiff's identity is used, without consent, to promote an unrelated product, such speech is actionable. *See Downing*, 265 F.3d 994; *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691–94 (9th Cir.1998) (use of pitcher's image in beer advertisement); *Abdul–Jabbar*, 85 F.3d at 409 (use of basketball star's former name in a television car commercial); *Waits*, 978 F.2d at 1097–98 (use of imitation of singer's voice in a radio snack-food commercial); *White v. Samsung Electronics Am., Inc.*, 971 F.2d 1395, 1396 (9th Cir.1992) (use of gameshow hostess's likeness in advertisement for electronic products). In *Downing*, clothing manufacturer Abercrombie & Fitch ("Abercrombie") used a photograph of plaintiffs competing in a surfing competition. *Downing*, 265 F.3d at 1000. The photograph was placed in a clothing catalog that also included news and editorial pieces about the surfing culture. *Id.* While the surfing theme of the catalog was conceded to be a matter of public interest, the *Downing* court found that the photograph's use did not contribute significantly to the editorial pieces about surfing culture. *Id.* at 1002 ("The catalog did not explain that [the plaintiffs] were legends of the sport and did not in any way connect [the plaintiffs] with the story preceding it."). Rather, the court reasoned that the defendant used the plaintiffs' photograph "essentially as window-dressing to advance the catalog's surf-theme." *Id.* Therefore, because the plaintiffs' likeness was used primarily to attract consumers to the unrelated product for sale in the sales catalog, such use was not protected by the First Amendment defense. *Id.*

In this case, the context of the communication and the nature of the information conveyed demonstrate that plaintiff Yeager's name and accomplishments were used to attract attention to defendant's unrelated wireless services. While emergency preparedness and the availability of wireless services following a natural disaster are matters or public interest and concern, as set forth above, the Publication in this case was not purely informational in nature; rather, it is properly characterized as commercial speech because, *inter alia,* it aimed to positively market defendant's services by linking them to that public concern. Further, plaintiff's name and accomplishments in breaking the sound barrier are wholly unrelated to defendant's mobile command centers and cellular service in emergency situations.[8] Indeed, as reflected by Siegel's testimony, the use of plaintiff's name was carefully crafted as part of a strategy to promote defendant's brand. (*See* Siegel Deposition, at 11:9–12, 16:16–23.) Even if the content of defendant's Publication could otherwise be considered within the public interest, the illustrative use of plaintiff's name does not contribute significantly to that interest; Like the use in *Downing*, which the court characterized as "window-dressing," the connection between public safety issues during hurricane season and the use of plaintiff's name is tenuous at best. *See Downing*, 265 F.3d at 1002.

Accordingly, defendant is not entitled to summary judgment on its asserted First Amendment defense.

### 2. Incidental Use

"The contours of the incidental use doctrine are not well-defined in Cali-

---

8. Furthermore, even though plaintiff's achievement may be said to be newsworthy, "its use is not automatically privileged." *See Abdul–Jabbar*, 85 F.3d at 416 (holding that the newsworthiness of a former basketball player's record-breaking achievement did not entitle the defendant to use the player's identity in the context of an unrelated car commercial).

fornia." *Aligo v. Time–Life Books, Inc.*, 1994 WL 715605, at *2, 1994 U.S. Dist. LEXIS 21559, at *6 (N.D.Cal. Dec. 19, 1994). "However, the general rule is that incidental use of a plaintiff's name or likeness does not give rise to liability" under a common law claim of commercial misappropriation or an action under Section 3344. *Id.* at *2, 1994 U.S. Dist. LEXIS 21559 at *8. The rationale underlying this doctrine is that an incidental use has no commercial value, and allowing recovery to anyone briefly depicted or referred to would unduly burden expressive activity. *Pooley v. Nat. Hole–In–One Ass'n,* 89 F.Supp.2d 1108, 1112 (D.Ariz.2000).

 Whether the use of a plaintiff's name or likeness falls within the incidental use exception to liability "is determined by the role that the use of the plaintiff's name or likeness plays in the main purpose and subject of the work at issue." *Preston v. Martin Bregman Prods., Inc.,* 765 F.Supp. 116, 119 (S.D.N.Y.1991). Generally, "a plaintiff's name is not appropriated by mere mention of it." Restatement (Second) of Torts § 652C, comment *d.* A claim is also not actionable when a plaintiff's likeness is appropriated because "it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him." *Id.*

 In determining whether the doctrine of incidental use applies, courts have considered "(1) whether the use has a unique quality or value that would result in commercial profit to the defendant, (2) whether the use contributes something of significance, (3) the relationship between the reference to the plaintiff and the purpose and subject of the work, and (4) the duration, prominence or repetition of the likeness relative to the rest of the publication." *Aligo,* 1994 WL 715605, at *3, 1994 U.S. Dist. LEXIS 21559, at *7–8 (internal citations omitted). Even if the mention of a plaintiff's name or likeness is brief, if the use stands out prominently within the commercial speech or enhances the marketability of the defendant's product or service, the doctrine of incidental use is inapplicable. *See Pooley,* 89 F.Supp.2d at 1113. In *Pooley,* the defendant used, without consent, the name of likeness of the plaintiff, a professional golfer who was well-known for making a hole-in-one shot and winning one million dollars as a result, in a marketing video for its "Million Dollar Hole–in–One" fundraising service. *Id.* at 1110–11. The footage of the plaintiff constituted only six seconds of the entire eight minute video. *Id.* While the court noted the duration of the use was relatively short in relation to the rest of the publication, the court found that the use was "crucial" to the defendant's advertisement because without it, the video would not have been as attractive to the target audience and because the plaintiff's hole-in-one was not fungible to that of any other golfer. *Id.* at 1112–13. The court also found that the plaintiff "was specifically selected because of his distinction and his wide market appeal." *Id.* at 1113. Accordingly, the court concluded that the incidental use doctrine did not apply because the use of the plaintiff's name and likeness was integral to the defendant's advertisement and "clearly enhanced the marketability of [the] defendant's services." *Id.; see also Schifano v. Greene County Greyhound Park, Inc.,* 624 So.2d 178, 181 (Ala.1993) (distinguishing the incidental use of a photograph of an unidentified and unknown person from the use of the recognizable name of a former college football star and an experienced radio announcer for solicitation purposes); *cf. Aligo,* 1994 WL 715605, at *3, 1994 U.S. Dist. LEXIS 21559, at *8 (holding that four-second appearance of a magazine cover featuring photograph of unnamed and unidentified plaintiff in a 29–minute "infomercial" promoting a rock music anthology was incidental use because it was one of dozens of magazine covers used in the

infomercial and insignificant to the purpose of selling a music anthology); *Preston*, 765 F.Supp. at 118–19 (holding that four-second facial appearance of unidentified and unnamed plaintiff in a street scene, shot from a moving vehicle in low light, during the opening credits of a movie was incidental use because it contributed nothing to the movie's storyline); *Ladany v. William Morrow & Co.*, 465 F.Supp. 870, 881 (S.D.N.Y.1978) (holding that incidental use doctrine applied when plaintiff was one of 101 characters in a book discussing in detail the Olympic massacre in Munich and the book referred to plaintiff only when discussing one out of the many aspects of the tragedy).

 In this case, under the circumstances in which defendant's name and identity was used, the court cannot conclude that the incidental use doctrine applies. Plaintiff's name and identity is unique and non-fungible in that he is the person associated with breaking the sound barrier for the first time. The use of his name and identity links defendant's new technology to plaintiff's name and accomplishments. Indeed, as set forth above, the evidence reveals that the Publication was crafted in order to make that very association and to "create positive associations in people's mind with the AT & T brand." (Siegel Dep. at 16, 18.) While the use of plaintiff's name and reference to his accomplishment was a small part of the 755–word Publication, the association of defendant's services with a historical feat is a use that may help to pique the interest of a newsman deciding whether to follow up on a press release. (*See* Deposition of Albert Levy at 111:4–19.) Therefore, like in *Pooley*, the use of plaintiff's name and identity uniquely enhanced the marketability of defendant's service. *See also Henley v. Dillard Dep't Stores*, 46 F.Supp.2d 587, 592 (N.D.Tex.1999) (holding that incidental use defense did not apply where the defendant used the value associated with a well-known musician's name in a "word-play" in order to attract consumers' attention); Accordingly, defendant is not entitled to summary judgment on its asserted incidental use defense.

Because under the facts before the court the defendant cannot establish as a matter of law that its use of plaintiff's name and identity is protected by the First Amendment or by the incidental use doctrine, defendant's motion for summary judgment on plaintiff's common law and statutory claims of commercial misappropriation is DENIED.

## B. Lanham Act

 Plaintiff claims that defendant violated the Lanham Act, specifically 15 U.S.C. § 1125(a), because the appearance of plaintiff's name in the Publication is likely to cause confusion about plaintiff's affiliation or connection to defendant. (Pl.'s Opp'n at 11.) "Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits, *inter alia*, the use of any symbol or device which is likely to deceive consumers as to the association, sponsorship, or approval of goods or services by another person." *Wendt v. Host Int'l*, 125 F.3d 806, 812 (9th Cir.1997). "An express purpose of the Lanham Act is to protect commercial parties against unfair competition." *Abdul–Jabbar*, 85 F.3d at 410 (quoting *Waits*, 978 F.2d at 1108). A false endorsement claim is actionable under the Lanham Act if such claim is based on the unauthorized use of a uniquely distinguishing characteristic of a celebrity's identity that is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product. *Wendt*, 125 F.3d at 812. "Because the names and likenesses of celebrities are commonly . . . used in a wide variety of publications, Lanham Act jurisprudence places great importance on the likelihood of consumer confusion as the 'determinative issue' in false endorsement claims." *Kournikova v. General Media*

*Commc'ns, Inc.,* 278 F.Supp.2d 1111, 1120 (C.D.Cal.2003). The likelihood that a well-known individual's name or likeness was used to promote a product with which he has no association raises the possibility of commercial injury. *Id.*

Defendant contends that plaintiff's claim fails as a matter of law because (1) plaintiff must and cannot demonstrate triable issues of fact regarding actual confusion because the Publication does not contain any express endorsement; and (2) the nominative fair use doctrine supports summary judgment.[9] (Def.'s Mem. at 13, 15.)

### 1. Likelihood Of Confusion

■■■■ "In cases involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona." *White,* 971 F.2d at 1400. In such cases, the Ninth Circuit has utilized the eight-factor test set forth in *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979), to determine whether there is a likelihood of confusion regarding endorsement arising out of a defendant's use of a plaintiff's mark. *Downing,* 265 F.3d at 1007; *Abdul–Jabbar,* 85 F.3d at 413; *White,* 971 F.2d at 1400. These factors include:

(1) strength of the plaintiff's mark;

(2) relatedness of the goods;

(3) similarity of the marks;

(4) evidence of actual confusion;

(5) marketing channels used;

(6) likely degree of purchaser care;

(7) defendant's intent in selecting the mark; and

(8) likelihood of expansion of the product lines.

*White,* 971 F.2d at 1400. These factors "are not necessarily of equal importance, nor do they necessarily apply to every case." *Downing,* 265 F.3d at 1008. Further, because "[t]he Lanham Act's 'likelihood of confusion' standard is predominantly factual in nature ... [s]ummary judgment is inappropriate when a jury could reasonably conclude that most of the factors weigh in a plaintiff's favor." *Wendt,* 125 F.3d at 812.

■■■■ In this case, plaintiff has presented sufficient evidence regarding likelihood of confusion to withstand summary judgment. Both plaintiff and defendant agree that Yeager is a public figure publicly associated with his accomplishment in breaking the sound barrier. (*See* Pl.'s Opp'n at 4; Def.'s Mem. at 12.) As such, his "mark" is strong. Further, there is no dispute that defendant used plaintiff's mark in its Publication, which was directed at creating positive associations with its services. A jury could infer that under these facts, defendant's intent was to capitalize upon the positive associations with plaintiff's name by implying endorsement in order to achieve its objectives. While there is little relationship between plaintiff's mark and the cellular services in emergency situations and scant specific evidence regarding actual confusion, the court cannot find that defendant is entitled to judgment as a matter of law at this stage in the litigation.[10]

---

**9.** Defendant also argues that the Lanham Act claim fails because plaintiff, as a public figure featured in a noncommercial speech, bears the burden of proving with clear and convincing evidence that defendant acted with actual malice. However, for reasons mentioned *supra,* the court does not characterize the Publication as noncommercial speech and, accordingly, need not reach the issue of actual malice.

**10.** The court notes that neither party fully addresses the application of the *Sleekcraft* factors in their briefs. Rather, defendant only argues that there has been no evidence of actual confusion. While this factor is important, it is not determinative. Further, while somewhat vague, Victoria Yeager testified that she received phone calls regarding confusion as to whether plaintiff endorsed defen-

## 2. Nominative Fair Use

 Nominative fair use is a specific defense to claims under the Lanham Act applied to "a class of cases where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one." *New Kids On The Block v. News Am. Publ'g, Inc.,* 971 F.2d 302, 308 (9th Cir.1992); *see Abdul–Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 412 (9th Cir. 1996).

 To establish a nominative fair use defense, a defendant must prove three elements:

(1) the product or service in question must be one not readily identifiable without use of the trademark;

(2) only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and

(3) the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Downing,* 265 F.3d at 994.[11] The doctrine of nominative fair use applies only when the mark is "the only word reasonably available to describe a particular thing." *Abdul–Jabbar,* 85 F.3d at 412. "Because it does not implicate the source-identification function that is the purpose of the trademark . . . such use is fair because it does not imply sponsorship or endorsement by the trademark holder." *Id.; see Cairns v. Franklin Mint Co.,* 292 F.3d 1139, 1155 (9th Cir.2002) (holding that there was no confusion regarding endorsement where the plaintiff's mark was not so closely associated with the plaintiff that any mention would suggest sponsorship or endorsement).

Where a celebrity's name is used in a commercial, there are triable issues of fact regarding whether such use implies endorsement. In *Abdul–Jabbar,* the defendant car manufacturer used the plaintiff's name in a commercial, comparing the famous basketball player's college basketball record to the defendant's awards for its car. 85 F.3d at 409. The court noted that by closely analogizing the plaintiff's record of being voted the best player in three consecutive years to the defendant's product being placed on the "best buy" list three years in a row, the defendant "arguably attempted to appropriate the cachet of one product for another, if not also to capitalize on consumer confusion." *Id.* at 413 (internal quotations omitted). The court held that because the "use of celebrity endorsements in television commercials is so well established by commercial custom," a jury might find an implied endorsement through the defendant's use of the plaintiff's name. *Id.* ("Many people may assume that when a celebrity's name is used in a television commercial, the celebrity endorses the product advertised. Likelihood of confusion is therefore a question for the jury."). Accordingly, the court held that there was a question of fact as whether the defendant was entitled to the nominative fair use defense. *Id.*

In this case, defendant has failed to meet its burden in establishing that the nominative fair use defense applies as a matter of law. Defendant used plaintiff's name and accomplishments to support its own product, specifically comparing plaintiff's feat in breaking the sound barrier to defendant's technological advancements. While not featured in a television commercial, the deliberate, closely-tied analogy in

dant's services. (Dep. of Victoria Yeager, Ex. H to Stroud Decl., at 134:2–13.)

**11.** The parties do not discuss the first two elements of this defense, but rather focus

their arguments on the third element, the likelihood of consumer confusion regarding endorsement because of defendant's conduct.

a press release directed to create positive associations with defendant's product is sufficient to raise a triable issue of fact regarding implied endorsement.[12] Indeed, Victoria Yeager testified that after the press release, she received a few calls inquiring about whether Yeager endorsed AT & T. (Dep. of Victoria Yeager, Ex. H to Stroud Decl., at 134:2–13.) Therefore, on the record before the court, defendant is not entitled to summary judgment on its asserted nominative fair use defense.

Accordingly, defendant's motion for summary judgment on the Lanham Act claim is DENIED.

### C. Plaintiff's Remaining Claims

Finally, defendant contends that plaintiff's claims for violation of California Business and Professions Code § 17200, violation of California False Advertising Act, and unjust enrichment must be dismissed because they are substantially congruent to plaintiff's commercial misappropriation and Lanham Act claims. Because, as set forth above, the court finds defendant's prior arguments unpersuasive, defendant's motion for summary judgment on the remaining state law claims is also DENIED.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

---

12. Furthermore, while defendant argues that its limited reference to plaintiff's name and accomplishment is insufficient to imply endorsement, it fails to proffer any evidence regarding what type of use would imply endorsement for purposes of comparison. *Cf.*

*Cairns,* 292 F.3d at 1154–55 (holding that the absence of statements regarding authorization that the defendant used in relation to other products supported applicability of nominative fair use defense).