In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1631

KRISTI J. CORTEZANO,

*Plaintiff-Appellant*,

*v.*

SALIN BANK & TRUST COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-00857-SEB-MJD—**Sarah Evans Barker**, *Judge.*

ARGUED SEPTEMBER 26, 2011—DECIDED MAY 21, 2012

Before CUDAHY, POSNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Kristi Cortezano filed suit against her former employer, Salin Bank & Trust Company, alleging national-origin discrimination based on her marriage to Javier Cortezano, a Mexican citizen whose presence in the United States was unauthorized. (We use the couple's first names to avoid confusion.) The district court granted Salin Bank's motion for summary judgment, finding that Kristi failed to establish that

her firing was based on an impermissible reason. Kristi now appeals. We find that any discrimination that led to Kristi's firing was not based on Javier's race or national origin, but rather on his status as an alien who lacked permission to be in the country. Because alienage is not a protected classification under Title VII, Kristi has no claim for relief, and so we affirm.

**I**

In 1997 Javier unlawfully entered the United States, where he took up residence without a valid visa or work permit. Some time later, he met Kristi and the two married in February 2001. In March 2007, Salin Bank hired Kristi as a Manager in Training. Kristi showed promise. Less than one month later, she was promoted to Bank Sales Manager, and a few months after that she was transferred to a more profitable location.

Meanwhile, Javier attempted to start a car detailing and repair business. Given his undocumented status, he lacked a social security number to open a business banking account for his new enterprise. To open the accounts he needed, Javier obtained an individual tax identification number (ITIN). See 26 U.S.C. § 6109; Treas. Reg. § 301.6109-1(b)(2) (foreign persons). Although the exact circumstances under which Javier obtained his ITIN are murky, this appeal comes to us from a motion for summary judgment, and so we assume that Javier properly received his identification number. *Chicago Reg'l Council of Carpenters v. Village of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011). Kristi named Javier a joint owner on

her account at Salin Bank, and with some help from Kristi, Javier used his ITIN to open two accounts of his own: a personal account, as well as a business account for his company, Cortezano Motors, Ltd. Javier's business venture floundered, unfortunately, and so in December 2007, he returned to Mexico to sort out his citizenship status.

Around that time, Kristi revealed Javier's unauthorized status to her supervisor at Salin Bank, Stacy Novotny, in connection with her request for a two-week vacation during which she planned to attend proceedings in Mexico to help Javier obtain U.S. citizenship. Novotny granted the request, and Kristi traveled to Mexico from January 24 to February 8, 2008.

After learning about Javier's situation, Novotny did not let matters lie. Instead, she called Salin Bank's security officer, Mike Hubbs, and told him that Kristi had joint accounts at the bank with a known undocumented alien. Hubbs verified that Javier was indeed on these accounts. Concerned that this arrangement might implicate laws against bank fraud, Hubbs scheduled a meeting with Novotny and Kristi for February 11, 2008.

During this meeting, Kristi admitted that Javier had illegally entered the United States. She urged, however, that he was then in Mexico trying to obtain a visa or U.S. citizenship so that he could rejoin her. Hubbs did not see this as an excuse; instead, he emphasized his concern that Javier, as an "illegal alien from Mexico," must have used fraudulent documents to open his accounts.

As the meeting progressed, Hubbs's temper flared. When Novotny briefly stepped out of the room, Hubbs got in Kristi's face, screamed at her, called Javier a "piece of shit," and demanded that Kristi admit that Javier illegally opened his Salin Bank accounts. Unconvinced by Kristi's repeated statements that Javier's ITIN, other documentation, and accounts were legitimate, Hubbs informed Kristi that he would be filing an internal Suspicious Activity Report.

In the course of collecting information for his report, Hubbs emailed several Salin Bank supervisors to inform them that Javier had "gained entry into the US illegally," "illegally obtained an Indiana [Driver's License]" by providing "false identification" and used this documentation to open his accounts at Salin Bank. Hubbs's completed report harped on the fact that Javier was an "illegal alien." At this point, Salin Bank seems to have considered firing Kristi. A draft "Termination Notice," which identified Kristi's complicit behavior in Javier's alleged fraud as the reason for her firing, was circulated among the human resources department and Novotny on February 13. This notice, however, was never signed or sent to Kristi.

On February 19 Kristi and her attorney attempted to attend a scheduled meeting with Salin Bank representatives regarding the ongoing investigation. The Bank, however, refused to admit Kristi's attorney to the meeting, stating that the meeting was a "private matter" related to internal "Salin Bank business." Kristi replied that she would not attend the meeting without her at-

torney. At an impasse, Kristi and her attorney began to leave. One of the Salin Bank representatives called after them, telling Kristi that by walking away from the meeting she was "abandoning [her] job." Kristi left nevertheless. That afternoon, Salin Bank drafted, signed, and sent a letter to Kristi, terminating her employment for refusing to participate in the meeting.

After Kristi was fired, Hubbs reported Kristi's activity to U.S. Immigration and Customs Enforcement. He also attended, on behalf of Salin Bank, a June 4, 2008, meeting of the Fraud Financial Network, which is a loose consortium of banks in northeast Indiana with the mission of rooting out fraud. According to the minutes of that meeting, Hubbs warned the other banks that Kristi was fired for opening fraudulent accounts for Javier, an "illegal immigrant who is now back in Mexico."

On September 11, 2008, Kristi filed suit in Indiana state court, claiming that Salin Bank had blacklisted her, defamed her, and intentionally caused her emotional distress. In 2009, she amended her complaint to add a claim for employment discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.* In light of the new federal claim, Salin Bank removed the case to the U.S. District Court for the Southern District of Indiana. On February 15, 2011, the district court granted Salin Bank's motion for summary judgment on all claims.

## II

We review the district court's grant of summary judgment *de novo. Chicago Reg'l Council of Carpenters*, 644 F.3d

at 356. In order to succeed on her claim for employment discrimination under Title VII, Kristi's first task is to show that she belongs to a statutorily protected class. Here, Kristi alleges that she was discriminated against because of her marriage to a Mexican citizen whose residence in the United States was unauthorized. We have not yet decided whether discrimination based on the race or national origin of a person's spouse or partner falls within the protections of Title VII. *Ineichen v. Ameritech Corp.*, 410 F.3d 956, 961-62 (7th Cir. 2005). Although we note that several of our sister circuits have ruled that Title VII's protections apply in such cases, *e.g.*, *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 183 F.3d 988, 994 (6th Cir. 1999); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 891-92 (11th Cir. 1986), the answer to this question is immaterial to Kristi's case, and so we leave it for another day.

Even assuming that Title VII applies to discrimination against one's spouse, Kristi's claim falls short because it is based on Javier's alienage, which is not protected by the statute. Even reading the record in the light most favorable to Kristi, it is beyond dispute that Salin Bank's actions were motivated by the fact that Javier's presence in the United States was unauthorized. Novotny first called Hubbs because she learned that Kristi's husband was an undocumented alien. Hubbs's report repeatedly noted that Javier was "smuggled into the US illegally," had "resid[ed] in the US illegally," was an "illegal alien" and an "illegal immigrant." The report barely notes Javier's Mexican heritage, making only

passing references to Javier and Kristi's trips to Mexico. Even Hubbs's tirade in his first meeting with Kristi, disagreeable as it was, emphasized Javier's unauthorized status, not his Mexican ancestry. And the *coup de grâce* is the fact that after Kristi was fired, Hubbs reported his findings to federal immigration authorities.

There are several reasons why Salin Bank might have been concerned about Kristi's assistance to Javier in opening his accounts. Even assuming that Javier's ITIN was legitimate, Salin Bank might have wanted to avoid holding accounts for people who illegally reside in the United States. It would hardly advance the bank's business to be known as a resource for such aliens. Indeed, these concerns are reflected in the unsent draft Termination Notice of February 13. Hubbs initially highlighted his concern about possible bank fraud or other violations of banking regulations, but his decision to call U.S. Immigration and Customs Enforcement, rather than local or federal banking authorities, could be seen as an effort immediately to dissociate the bank from any irregularity. The record leaves no doubt that Salin Bank's decision to fire Kristi was not taken because Javier was Mexican, but because Javier was an undocumented alien.

The question, then, is whether Title VII guards against alienage-based discrimination. It does not. Discrimination based on one's status as an immigrant might have been included within the ambit of "national origin" discrimination, see 42 U.S.C. § 2000e-2(a)(1), but that is not the path the Supreme Court has taken. The

Court instead chose almost 40 years ago to adopt a narrower definition of national origin discrimination for purposes of Title VII. See *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86 (1973). Reviewing the statute's legislative history, the Court concluded that the term "national origin" was limited to "the country from which you or your forebears came." *Espinoza*, 414 U.S. at 89 (quoting 110 Cong. Rec. 2549 (1964) (statement of Rep. Roosevelt)). Thus, national origin discrimination as defined in Title VII encompasses discrimination based on one's ancestry, but not discrimination based on citizenship or immigration status. *Id.* The Court thought that it would have been inconsistent for Congress to have proscribed discrimination against aliens given the "longstanding practice of requiring federal employees to be United States citizens." *Id*. at 90. In light of these conclusions, the Court explicitly held that "nothing" in Title VII "makes it illegal to discriminate on the basis of citizenship or alienage." *Espinoza*, 414 U.S. at 95.

We acknowledge that Congress took steps to limit *Espinoza*'s holding when it enacted 8 U.S.C. § 1324b in 1996. That statute addressed the subject of unfair immigration-related employment practices; it reads as follows in the relevant part:

> (a) Prohibition of discrimination based on national origin or citizenship status
>
> > (1) General rule
> >
> > It is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual *(other than an unautho-*

*rized alien*, as defined in section 1324a(h)(3) of this title) with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment—

> (A) because of such individual's national origin, or

> (B) in the case of a protected individual (as defined in paragraph (3)), because of such individual's citizenship status.

8 U.S.C. § 1324b(a)(1) (emphasis added); see also *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1984 (2011). But, even apart from the fact that Kristi did not seek to rely on this statute and the fact that it is not clear that it covers spouses, she cannot overcome the statute's explicit exclusion of unauthorized aliens from its coverage. Kristi has never contested the fact that Javier was not lawfully present in the country, and as far as we can tell, that is the end of it. Any discrimination suffered by Kristi was not the result of her marriage to a Mexican, but rather the result of her marriage to an unauthorized alien. Under the circumstances, the district court correctly granted summary judgment in Salin Bank's favor on Kristi's claims under federal law.

## III

We turn now to Kristi's supplemental state law claims, all of which are based on Indiana law. Generally, when a court has dismissed all the federal claims in a lawsuit

before trial, it should relinquish jurisdiction over supplemental state law claims rather than resolve them on the merits. *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010). When the resolution of these claims is clear, nonetheless, the court may choose to decide them. See 28 U.S.C. § 1367(c) (listing permissible reasons for declining to exercise supplemental jurisdiction). *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). The district court here committed no error by choosing to dispose of these claims as well.

## A

Kristi's first state law claim is for intentional infliction of emotional distress. To survive summary judgment, she must show that Salin Bank engaged in (1) extreme and outrageous conduct that (2) intentionally or recklessly (3) caused (4) severe emotional distress. *York v. Frederick*, 947 N.E.2d 969, 976 (Ind. Ct. App. 2011). The conduct alleged must be "so outrageous" and "so extreme" so as to go "beyond all possible bounds of decency." *Id.* at 976-77. As we have observed before, Indiana "courts have been reluctant to award damages for intentional infliction of emotional distress in employment cases." *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1998).

*McCreary* is instructive. In that case, the defendant "called McCreary into his office and confronted him, pointing his finger into McCreary's face and with a raised voice saying, '[t]his is a bunch of bullshit.'" *Id.* at

1161. Despite this rude behavior, we affirmed the district court's grant of summary judgment for the defendant, ruling that this conduct was a "far cry" from the sort of "extreme and outrageous conduct" that was required for recovery for intentional infliction of emotional distress. *Id.* at 1167.

The similarity between the conduct in *McCreary* and that in this case is apparent. Hubbs, according to Kristi, shouted directly in her face that Javier was "garbage" and a "piece of shit." Although Hubbs's actions strike us as unprofessional, inappropriate, and no doubt upsetting, this "isolated and brief incident which took place out of the presence of others" did not meet the standard Indiana requires to establish extreme and outrageous conduct. *McCreary*, 132 F.3d at 1167. Thus, we affirm the district court's grant of summary judgment on this claim.

## B

Kristi also asserts that Salin Bank defamed her and blacklisted her. For her claim of defamation to survive summary judgment, Kristi is required to demonstrate, among other things, that Salin Bank made statements that injured or diminished her reputation. *Wells v. Bernitt*, 936 N.E.2d 1242, 1246 (Ind. App. 2010). Her blacklisting theory requires proof that Salin Bank attempted "to prevent [her] . . . from obtaining employment with any other person, or company." IND. CODE § 22-5-3-2.

After discovery, Kristi has managed to find only one piece of evidence in support of these claims: an email

containing an excerpt of the minutes from the June 4, 2008, Fraud Financial Network meeting. She argues that this email, which warned the other banks in the Network not to hire her because "she had been opening up fraudulent accounts for her husband (an illegal immigrant who is now back in Mexico)," injured her professional reputation and prevented her from finding employment at other banks in the Network.

Salin Bank argues that this email is inadmissible hearsay and therefore carries no weight at summary judgment. Kristi responds that it not hearsay because she is not offering it for the truth of the matter asserted. FED. R. EVID. 801. Specifically, she contends that it is not offered to prove that she actually committed fraud, but rather only that Hubbs accused her of doing so. Kristi's interpretation misreads the email: The email states that "Salin warned . . . [that] she had been opening up fraudulent accounts . . . ." Thus, the email indicates that Salin Bank made certain statements, and its only possible use is to show that the Bank did in fact make those statements. The email is inadmissible hearsay, and the district court properly disregarded it on summary judgment. FED. R. CIV. P. 56(c)(2). Kristi presents no other proof in support of her claims for defamation and blacklisting, and so we affirm their dismissal.

## IV

Finally, Kristi seeks to have the names of her minor children stricken from Salin Bank's memorandum in support of its motion for summary judgment, in accor-

dance with FED. R. CIV. P. 5.2(a). Although Kristi filed a motion to strike with the district court, it did not rule on that motion prior to this appeal. At oral argument, counsel for Salin Bank conceded that the names should not have been included, and the bank offered no objection to Kristi's motion. Therefore, we REMAND WITH INSTRUCTIONS to strike the names of the minor children from Salin Bank's memorandum, but we AFFIRM the judgment of the district court in all other respects.