In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1992

MICHAEL JORDAN,

*Plaintiff-Appellant*,

*v.*

JEWEL FOOD STORES, INC. and
SUPERVALU INC.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 340 — **Gary S. Feinerman**, *Judge*.

ARGUED OCTOBER 23, 2012 — DECIDED FEBRUARY 19, 2014

Before FLAUM and SYKES, *Circuit Judges*, and RANDA, *District Judge.*[*]

[*] Honorable Rudolph T. Randa, District Judge of the United States District Court for the Eastern District of Wisconsin, sitting by designation.

SYKES, *Circuit Judge*. This trademark and right-of-publicity dispute pits basketball legend Michael Jordan against Jewel Food Stores, Inc., the operator of 175 Jewel-Osco supermarkets in and around Chicago. On the occasion of Jordan's induction into the Naismith Memorial Basketball Hall of Fame in September 2009, Time, Inc., the publisher of *Sports Illustrated*, produced a special commemorative issue of *Sports Illustrated Presents* devoted exclusively to Jordan's remarkable career. Jewel was offered free advertising space in the issue in exchange for agreeing to stock the magazine in its stores. Jewel accepted the offer and submitted a full-page ad congratulating Jordan on his induction into the Hall of Fame. The ad ran on the inside back cover of the commemorative issue, which was available on newsstands for a three-month period following the induction ceremony.

To Jordan the ad was not a welcome celebratory gesture but a misappropriation of his identity for the supermarket chain's commercial benefit. He responded with this $5 million lawsuit alleging violations of the federal Lanham Act, the Illinois Right of Publicity Act, the Illinois deceptive-practices statute, and the common law of unfair competition. Jewel denied liability under these laws and also claimed a blanket immunity from suit under the First Amendment. The district court sided with Jewel on the constitutional defense, prompting this appeal.

Jewel maintains that its ad is "noncommercial" speech and thus has full First Amendment protection. Jordan insists that the ad is garden-variety commercial speech, which gets reduced constitutional protection and may give rise to liability for the private wrongs he alleges in this case. As the case comes

to us, the commercial/noncommercial distinction is potentially dispositive. If the ad is properly classified as commercial speech, then it may be regulated, normal liability rules apply (statutory and common law), and the battle moves to the merits of Jordan's claims. If, on the other hand, the ad is fully protected expression, then Jordan agrees with Jewel that the First Amendment provides a complete defense and his claims cannot proceed. The district court held that the ad was fully protected noncommercial speech and entered judgment for Jewel.

We reverse. Jewel's ad, reproduced below, prominently features the "Jewel-Osco" logo and marketing slogan, which are creatively and conspicuously linked to Jordan in the text of the ad's congratulatory message. Based on its content and context, the ad is properly classified as a form of image advertising aimed at promoting the Jewel-Osco brand. The ad is commercial speech and thus is subject to the laws Jordan invokes here. The substance of Jordan's case remains untested, however; the district court's First Amendment ruling halted further consideration of the merits. We remand for further proceedings.

## I. Background

On September 11, 2009, Jordan was inducted into the Basketball Hall of Fame.[1] In light of the occasion, Time, Inc., the

---

[1] Jordan, of course, is the superstar former Chicago Bulls basketball player. During his fabled career, Jordan led the Bulls to six National Basketball

(continued...)

publisher of *Sports Illustrated*, produced a special edition of *Sports Illustrated Presents* to celebrate Jordan's noteworthy career. The commemorative issue was not distributed to regular *Sports Illustrated* subscribers, but rather was sold separately in stores. The issue was titled "Jordan: Celebrating a Hall of Fame Career" and was slated to be offered for sale from late October 2009 until late January 2010.

About a month prior to publication, a Time sales representative contacted Jewel to offer free advertising space in the commemorative issue in return for a promise to stock and sell the magazines in its stores. Jewel agreed to the deal and had its marketing department design a full-page color ad. The ad combines textual, photographic, and graphic elements, and prominently includes the Jewel-Osco logo and the supermarket chain's marketing slogan, "Good things are just around the corner." The logo and slogan—both registered trademarks— are positioned in the middle of the page, above a photo of a

---

[1] (...continued)

Association championships, winning myriad awards and countless accolades as the best player in the game. *See Legends profile: Michael Jordan*, NBA HISTORY, http://www.nba.com/history/legends/michael-jordan (Mar. 4, 2013, 4:14 PM) (last visited Feb. 10, 2014). Although the district court did not make a factual finding on the matter, according to the NBA's website, Jordan is "[b]y acclamation … the greatest basketball player of all time." *Id.* For another view, see *NBA's best all-time? You be the judge*, CHI. TRIB. (Mar. 23, 2012), http://articles.chicagotribune.com/2012-03-23/sports/ct-spt-0324-mitchell--20120324_1_the-nba-kareem-abdul-jabbar-lebron-james (last visited Feb. 10, 2014), suggesting that the "best ever" title should go to Kareem Abdul-Jabbar based on lifetime statistics. The Milwaukee judges on this panel would not dissent from that.

pair of basketball shoes, each bearing Jordan's number "23." The text of the ad reads as follows:

## A Shoe In!

> After six NBA championships, scores of rewritten record books and numerous buzzer beaters, Michael Jordan's elevation in the Basketball Hall of Fame was never in doubt! Jewel-Osco salutes #23 on his many accomplishments as we honor a fellow Chicagoan who was "just around the corner" for so many years.

Time accepted Jewel's ad and placed it on the inside back cover of the commemorative issue, which featured *Sports Illustrated* editorial content and photographs from the magazine's prior coverage of Jordan's career. Among other advertisements, the commemorative issue also contained a full-page congratulatory ad by a rival Chicago-area grocery chain.[2] We include a copy of Jewel's ad at the end of this opinion.

Soon after the commemorative issue hit the newsstands, Jordan filed this lawsuit against Jewel in Illinois state court alleging violations of the Illinois Right of Publicity Act, 765 ILL. COMP. STAT. 1075/1 *et seq.*; the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/2 *et seq.*; the Illinois common law of unfair competition; and the federal Lanham Act, 15 U.S.C. § 1125. He sought $5 million in damages, plus punitive damages on the state-law claims and

---

[2] Jordan has sued that grocery chain as well. *See Jordan v. Dominick's Finer Foods, LLC*, No. 1:10-cv-00407 (N.D. Ill. filed Jan. 20, 2010). That suit remains pending.

treble damages on the Lanham Act claim. Jewel removed the case to federal court.[3]

Following discovery, Jewel moved for summary judgment raising the First Amendment as a defense and arguing that its ad qualified as "noncommercial" speech and was entitled to full constitutional protection. Jordan filed a cross-motion for partial summary judgment on the issue of whether Jewel's ad was a commercial use of his identity. In a thoughtful opinion, the district court agreed with Jewel that the ad was noncommercial speech and sought further briefing on the implications of that classification. Jewel maintained that the commercial-speech ruling conclusively defeated all of Jordan's claims. Jordan agreed, accepting Jewel's position that the First Amendment provided a complete defense. The court accordingly entered final judgment in favor of Jewel, and Jordan appealed.

## II. Discussion

### A. Some Context for the Commercial-Speech Classification

Jordan's appeal requires us to decide whether Jewel's ad is properly classified as commercial speech or noncommercial speech under the Supreme Court's First Amendment

---

[3] Jordan also named SuperValu Inc., Jewel's former parent company, as a defendant. SuperValu's presence in the case is irrelevant to the issues on appeal, so we needn't comment on it any further. Also, after removal Jewel filed a third-party complaint against Time and its ad designer, Vertis, Inc., asserting various contingent claims in the event that it is found liable to Jordan. Time responded with a counterclaim against Jewel. For present purposes, the dispute between Jordan and Jewel is the relevant one.

jurisprudence. Before addressing the substance of that question, we take a moment to place it in the context of the claims raised in this litigation, which arise from different sources of law but all center on Jordan's allegation that Jewel misappropriated his identity for its commercial benefit.

Jordan is a sports icon whose name and image are deeply embedded in the popular culture and easily recognized around the globe. His singular achievements on the basketball court have made him highly sought after as a celebrity endorser; as a retired player who continues to reap the economic value of his reputation in the history of the game, he understandably guards the use of his identity very closely. The Lanham Act and the other laws he invokes here enable him to do that.

Jewel argues that Jordan's claims can't succeed because its ad is fully protected noncommercial speech under the First Amendment. We understand this to be an argument that the First Amendment prevents the court from applying these laws to any speech that is considered "noncommercial" in the constitutional sense, thus providing a complete constitutional defense to all claims. Jordan accepts this legal premise, so we take the point as conceded. But the law in this area is considerably more complex than the parties' agreement implies.[4]

---

[4] The analytical ground shifted a bit during oral argument. Jewel's counsel argued that the federal and state laws at issue here, by their own terms, apply only to commercial speech as defined by First Amendment jurisprudence. So Jewel's free-speech defense might be understood as using the First Amendment commercial-speech inquiry as a proxy for determining whether the speech potentially falls within the scope of these laws. It is true

(continued...)

The Supreme Court has generally worked out its commercial-speech doctrine in public-law cases. *See generally City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) (challenging a municipal ban on distribution of commercial publications on newsstands on public property); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) (challenging a public university's ban on "Tupperware"-style housewares parties in dormitories); *Riley v. Nat'l Fed. of the Blind of N.C.*, 487 U.S. 781 (1988) (challenging a state statute regulating fees charged by professional charitable fundraisers); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) (challenging a federal statute prohibiting the mailing of unsolicited contraceptive advertisements); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) (challenging a state regulation banning promotional advertising by utilities); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (challenging a state statute prohibiting pharmacists from advertising the prices of prescription drugs). In the public-law context, the commercial/noncommercial

---

[4] (...continued)

that each of the statutory and common-law claims alleged here has a "commercial" element in one form or another, but it's not clear that the Supreme Court's commercial-speech doctrine should be used to define this term in each cause of action. As to the Lanham Act claim in particular, we have cautioned against interpreting the scope of the statute in this way. *See First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir. 2001). We don't need to address this matter further because the parties haven't briefed the extent to which the scope of the Lanham Act (or the state laws) is coextensive with the Supreme Court's constitutional commercial-speech doctrine.

classification determines the proper standard of scrutiny to apply to the law or regulation under review in the case.

This is not a public-law case; it's a clash of private rights. Even if Jewel's ad qualifies as noncommercial speech, it's far from clear that Jordan's trademark and right-of-publicity claims fail without further ado. According to a leading treatise on trademark and unfair-competition law, there is no judicial consensus on how to resolve conflicts between intellectual-property rights and free-speech rights; instead, the courts have offered "a buffet of various legal approaches to [choose] from." 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31.139 (4th ed. 2013). The Supreme Court has not addressed the question, and decisions from the lower courts are a conflicting mix of balancing tests and frameworks borrowed from other areas of free-speech doctrine.[5]

Jordan's litigating position allows us to sidestep this complexity. The parties have agreed that if Jewel's ad is

---

[5] *See, e.g.*, *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1015–18 (3d Cir. 2008) (canvassing the caselaw but ultimately avoiding the issue after finding that the film in question was commercial speech); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001–03 (9th Cir. 2001) (rejecting a First Amendment defense to right-of-publicity claim under California law); *Hoffman v. Capital Cities/ABC Inc.*, 255 F.3d 1180, 1184–86 (9th Cir. 2001) (resolving a First Amendment defense in a case raising Lanham Act and state-law right-of-publicity claims by using the "actual malice" standard applicable in defamation cases); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 968–76 (10th Cir. 1996) (resolving a First Amendment defense in a state-law right-of-publicity case by balancing the free-speech interests against the intellectual-property interests).

"noncommercial speech" in the constitutional sense, then the First Amendment provides a complete defense to all claims in this suit. We're not sure that's right, but for now we simply note the issue and leave it for another day. With that large unsettled question reserved, we move to the task of classifying Jewel's ad as commercial or noncommercial speech for constitutional purposes. This is a legal question, so our review is de novo. *Bolger*, 463 U.S. at 65 ("[W]e must first determine the proper classification of the mailings at issue here."); *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002) (explaining that the question whether speech is protected by the First Amendment is a question of law that we review de novo).

## B. Commercial or Noncommercial Speech?

### 1. *The commercial-speech doctrine*

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. CONST. amend. I. Because "'not all speech is of equal First Amendment importance,'" *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)), certain categories of speech receive a lesser degree of constitutional protection. Commercial speech was initially viewed as being outside the ambit of the First Amendment altogether. *See Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942). That understanding has long since been displaced. Current doctrine holds that commercial speech is constitutionally protected but governmental burdens on this category of speech are scrutinized more leniently than burdens on fully protected noncommercial

speech. *See Fox*, 492 U.S. at 477 ("Our jurisprudence has emphasized that commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." (internal quotation marks omitted)); *Zauderer v. Office of Disciplinary Counsel of the Sup. Ct. of Ohio*, 471 U.S. 626, 637 (1985) ("There is no longer any room to doubt that what has come to be known as 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'").

The Court's rationale for treating commercial speech differently rests on the idea that commercial speech is "more easily verifiable by its disseminator" and "more durable"—that is, less likely to be chilled by regulations—than fully protected noncommercial speech. *Va. Pharmacy Bd.*, 425 U.S. at 771 n.24. Other cases explain that the more deferential degree of judicial scrutiny is justified because commercial speech "'occurs in an area traditionally subject to government regulation.'" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001) (quoting *Cent. Hudson*, 447 U.S. at 562 ). Whatever the justification, the Court has not strayed from its commercial-speech jurisprudence despite calls for it to do so. *See id.* at 554–55 (acknowledging disagreement among members of the Court as to what level of scrutiny applies to regulations on commercial speech but nonetheless refusing to "break new ground").

To determine whether speech falls on the commercial or noncommercial side of the constitutional line, the Court has

provided this basic definition: Commercial speech is "speech that proposes a commercial transaction."[6] *Fox*, 492 U.S. at 482 (emphasis deleted) (citing *Va. Pharmacy Bd.*, 425 U.S. at 761); *see also Discovery Network*, 507 U.S. at 423 ("In *Fox*, we … characteriz[ed] the proposal of a commercial transaction as '*the test* for identifying commercial speech.'" (quoting *Fox*, 492 U.S. at 473–74)); *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915, 917–18 (7th Cir. 1984) (explaining that the "hallmark of commercial speech" is that it "pertains to commercial transactions," including those "facilitated through the use of a trademark").

It's important to recognize, however, that this definition is just a starting point. Speech that does *no more than* propose a commercial transaction "fall[s] within the core notion of commercial speech," *Bolger*, 463 U.S. at 66, but other communications also may "'constitute commercial speech notwithstanding the fact that they contain discussions of important public issues,'" *Fox*, 492 U.S. at 475 (quoting *Bolger*, 463 U.S. at 67–68). *See also Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93–94 (2d Cir. 2010) (explaining that the commercial-speech doctrine encompasses more than the core notion of "speech which does 'no more than propose a commercial transaction'" (quoting *Bolger*, 463 U.S. at 66)); *Bad Frog Brewery, Inc. v. N.Y. State Liquor*

---

[6] The Court has also defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). This formulation has largely fallen into disuse, though it has never been expressly disavowed. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422–23 (1993) (discussing the two standards).

*Auth.*, 134 F.3d 87, 97 (2d Cir. 1998) (explaining the difference between the core notion of commercial speech and other types of commercial speech); *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995) (noting the "core" definition of commercial speech but also observing that the commercial-speech category is not limited to speech that does no more than propose a commercial transaction).

Indeed, the Supreme Court has "'made clear that advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech.'" *Zauderer*, 471 U.S. at 637 n.7 (quoting *Bolger*, 463 U.S. at 68) (internal quotation marks omitted). Although commercial-speech cases generally rely on the distinction between speech that proposes a commercial transaction and other varieties of speech, *id.* at 637, it's a mistake to assume that the boundaries of the commercial-speech category are marked exclusively by this "core" definition.[7] *See Bolger*, 463 U.S. at 66–68 (applying the commercial-speech classification to informational pamphlets discussing the benefits of prophylactics but also describing the manufacturer's prophylactic products). To the contrary, there is a "common-sense distinction" between commercial speech and other

---

[7] This point is sometimes overlooked, probably because when the Supreme Court first extended First Amendment protection to commercial speech, it phrased the issue this way: "Our question is whether speech which does *no more than* propose a commercial transaction is so removed from any exposition of ideas … that it lacks all protection." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (emphasis added) (citations and internal quotation marks omitted).

varieties of speech, and we are to give effect to that distinction. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978) (citing *Va. Pharmacy Bd.*, 425 U.S. at 771) (internal quotation marks omitted).

The Supreme Court's decision in *Bolger* is instructive on this point. *Bolger* dealt with the question of how to classify speech with both noncommercial and commercial elements. There, a prophylactics manufacturer published informational pamphlets providing general factual information about prophylactics but also containing information about the manufacturer's products in particular. *Bolger*, 463 U.S. at 62. The manufacturer brought a pre-enforcement challenge to a federal statute that prohibited the unsolicited mailing of advertisements about contraceptives. The Supreme Court held that although the pamphlets did not expressly propose a commercial transaction, they were nonetheless properly classified as commercial speech based on the following attributes: the pamphlets were a form of advertising, they referred to specific commercial products, and they were distributed by the manufacturer for economic purposes. *Id.* at 66–67.

We have read *Bolger* as suggesting certain guideposts for classifying speech that contains both commercial and noncommercial elements; relevant considerations include "whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *See United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009) (citing *Bolger*, 463 U.S. at 66–67). This is just a general framework, however; no one factor is sufficient, and *Bolger* strongly implied that all are not necessary. *See Bolger*,

463 U.S. at 67 n.14 ("Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial.").

### 2. *Applying the doctrine*

Jewel argues that its ad doesn't propose a commercial transaction and therefore flunks the leading test for commercial speech. As we have explained, the commercial-speech category is not limited to speech that directly or indirectly proposes a commercial transaction. Jewel nonetheless places substantial weight on this test, and the district judge did as well. Although neither relies exclusively on it, the district court's opinion and Jewel's defense of it on appeal both press heavily on the argument that the ad doesn't propose a commercial transaction, so we will start there.

It's clear that the textual focus of Jewel's ad is a congratulatory salute to Jordan on his induction into the Hall of Fame. If the literal import of the words were all that mattered, this celebratory tribute would be noncommercial. But evaluating the text requires consideration of its context, and this truism has special force when applying the commercial-speech doctrine. Modern commercial advertising is enormously varied in form and style.

We know from common experience that commercial advertising occupies diverse media, draws on a limitless array of imaginative techniques, and is often supported by sophisticated marketing research. It is highly creative, sometimes abstract, and frequently relies on subtle cues. The notion that

an advertisement counts as "commercial" only if it makes an appeal to purchase a particular product makes no sense today, and we doubt that it ever did. An advertisement is no less "commercial" because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service. Applying the "core" definition of commercial speech too rigidly ignores this reality. Very often the commercial message is general and implicit rather than specific and explicit.

Jewel's ad served two functions: congratulating Jordan on his induction into the Hall of Fame and promoting Jewel's supermarkets. The first is explicit and readily apparent. The ad contains a congratulatory message remarking on Jordan's record-breaking career and celebrating his rightful place in the Basketball Hall of Fame. Jewel points to its longstanding corporate practice of commending local community groups on notable achievements, giving as examples two public-service ads celebrating the work of Chicago's Hispanocare and South Side Community Services. The suggestion seems to be that the Jordan ad belongs in this "civic booster" category: A praiseworthy "fellow Chicagoan" was receiving an important honor, and Jewel took the opportunity to join in the applause.

But considered in context, and without the rose-colored glasses, Jewel's ad has an unmistakable commercial function: enhancing the Jewel-Osco brand in the minds of consumers. This commercial message is implicit but easily inferred, and is the dominant one.

We begin by making a point that should be obvious but seems lost on Jewel: There is a world of difference between an

ad congratulating a local community group and an ad congrat-ulating a famous athlete. Both ads will generate goodwill for the advertiser. But an ad congratulating a famous athlete can only be understood as a promotional device for the advertiser. Unlike a community group, the athlete needs no gratuitous promotion and his identity has commercial value. Jewel's ad cannot be construed as a benevolent act of good corporate citizenship.

As for the other elements of the ad, Jewel-Osco's graphic logo and slogan appear just below the textual salute to Jordan. The bold red logo is prominently featured in the center of the ad and in a font size larger than any other on the page. Both the logo and the slogan are styled in their trademarked ways. Their style, size, and color set them off from the congratulatory text, drawing attention to Jewel-Osco's sponsorship of the tribute. Apart from the basketball shoes, the Jewel-Osco brand-name is the center of visual attention on the page. And the congratulatory message specifically incorporates Jewel's slogan: "as we honor a fellow Chicagoan who was 'just around the corner' for so many years." The ad is plainly aimed at fostering goodwill for the Jewel brand among the targeted consumer group—"fellow Chicagoans" and fans of Michael Jordan—for the purpose of increasing patronage at Jewel-Osco stores.

The district judge nonetheless concluded that the ad was not commercial speech based in part on his view that "readers would be at a loss to explain what they have been invited to buy," a reference to the fact that the ad features only the tribute to Jordan, the Jewel-Osco logo and slogan, and a pair of

basketball shoes. Granted, Jewel does not sell basketball shoes; it's a chain of grocery stores, and this ad contains not a single word about the specific products that Jewel-Osco sells, nor any product-specific art or photography. The Supreme Court has said that the failure to reference a specific product is a relevant consideration in the commercial-speech determination. *See Bolger*, 463 U.S. at 66–67. But it is far from dispositive, especially where "image" or brand advertising rather than product advertising is concerned.

Image advertising is ubiquitous in all media. Jewel's ad is an example of a neighborly form of general brand promotion by a large urban supermarket chain. What does it invite readers to buy? Whatever they need from a grocery store—a loaf of bread, a gallon of milk, perhaps the next edition of *Sports Illustrated*—from *Jewel-Osco*, where "good things are just around the corner." The ad implicitly encourages readers to patronize their local Jewel-Osco store. That it doesn't mention a specific product means only that this is a different genre of advertising. It promotes brand loyalty rather than a specific product, but that doesn't mean it's "noncommercial."

The district judge was not inclined to put much stock in the ad's use of Jewel-Osco's slogan and graphic logo. Specifically, he considered the logo as little more than a convenient method of identifying the speaker and characterized the slogan as simply a means of ensuring "that the congratulatory message *sounded* like it was coming from Jewel." Dismissing the logo and slogan as mere nametags overlooks their value as advertising tools. The slogan is attached to the Jewel-Osco graphic logo and is repeated in the congratulatory message itself, which

describes Jordan as "a fellow Chicagoan who was 'just around the corner' for so many years." This linkage only makes sense if the aim is to promote shopping at Jewel-Osco stores. Indeed, Jewel's copywriter viewed the repetition of the slogan the same way we do; she thought it was "too selly" and "hitting too over the head."

In short, the ad's commercial nature is readily apparent. It may be generic and implicit, but it is nonetheless clear. The ad is a form of image advertising aimed at promoting goodwill for the Jewel-Osco brand by exploiting public affection for Jordan at an auspicious moment in his career.

Our conclusion is confirmed by application of the *Bolger* framework, which applies to speech that contains both commercial and noncommercial elements. Again, the *Bolger* inquiry asks whether the speech in question is in the form of an advertisement, refers to a specific product, and has an economic motive. *See Benson*, 561 F.3d at 725 (explaining the three *Bolger* factors).

Jewel's ad certainly qualifies as an advertisement in form. Although the text is congratulatory, the page nonetheless promotes something to potential buyers: Jewel-Osco supermarkets. Jewel's ad is easily distinguishable from the magazine's editorial content. Although the district court properly characterized it as "embrac[ing] the issue's theme," the ad obviously isn't part of the editorial coverage of Jordan's career. It isn't an article, a column, or a news photograph or illustration. It looks like, and is, an advertisement.

We can make quick work of the second and third *Bolger* factors. As we have explained, although no *specific* product or

service is offered, the ad promotes patronage at Jewel-Osco stores more generally. And there is no question that the ad serves an economic purpose: to burnish the Jewel-Osco brand name and enhance consumer goodwill. The record reflects that Jewel received Time's offer of free advertising space enthusiastically; its marketing representatives said it was a "great offer" and it "would be good for us to have our logo in *Sports Illustrated*" because "having your logo in any location where people see it is going to help your company." Indeed, Jewel gave Time valuable consideration—floor space in Jewel-Osco grocery stores—in exchange for the full-page ad in the magazine, suggesting that it expected valuable brand-enhancement benefit from it. We don't doubt that Jewel's tribute was in a certain sense public-spirited. We only recognize the obvious: that Jewel had something to gain by conspicuously joining the chorus of congratulations on the much-anticipated occasion of Jordan's induction into the Basketball Hall of Fame. Jewel's ad is commercial speech.

A contrary holding would have sweeping and troublesome implications for athletes, actors, celebrities, and other trademark holders seeking to protect the use of their identities or marks. Image advertising (also known as "institutional advertising") is commonplace in our society. Rather than expressly peddling particular products, this form of advertising features appealing images and subtle messages alongside the advertiser's brand name or logo with the aim of linking the advertiser to a particular person, value, or idea in order to build goodwill for the brand. *See* "Image advertising," CAMBRIDGE DICTIONARIES ONLINE, http://dictionary.cambridge.org/us/dictionary/business-english/image-advertising (last

visited Feb. 10, 2014); "Institutional advertising," *id.*, http://dictionary.cambridge.org/us/dictionary/business-english/institutional advertising (last visited Feb. 10, 2014).

To pick a current example for illustrative purposes, think of the television spots by the corporate sponsors of the Olympics. Many of these ads consist entirely of images of the American athletes coupled with the advertiser's logo or brand name and an expression of support for the U.S. Olympic team; nothing is explicitly offered for sale. Jewel's ad in the commemorative issue belongs in this genre. It portrays Jewel-Osco in a positive light without mentioning a specific product or service—in this case, by invoking a superstar athlete and a celebratory message with particular salience to Jewel's customer base. To say that the ad is noncommercial because it lacks an outright sales pitch is to artificially distinguish between product advertising and image advertising. Classifying this kind of advertising as constitutionally immune noncommercial speech would permit advertisers to misappropriate the identity of athletes and other celebrities with impunity.

Nothing we say here is meant to suggest that a company cannot use its graphic logo or slogan in an otherwise noncommercial way without thereby transforming the communication into commercial speech. Our holding is tied to the particular content and context of Jewel's ad as it appeared in the commemorative issue of *Sport Illustrated Presents*.

Before closing, we take this opportunity to clarify the proper use of the "inextricably intertwined" doctrine, which the district court relied on to support its decision. That doctrine holds that when commercial speech and noncommercial

speech are inextricably intertwined, the speech is classified by reference to the whole; a higher degree of scrutiny may be applied if the relevant speech "'taken as a whole'" is properly deemed noncommercial. *See Fox*, 492 U.S. at 474 (quoting *Riley*, 487 U.S. at 796). The central inquiry is not whether the speech in question combines commercial and noncommercial elements, but whether it was legally or practically impossible for the speaker to separate them.

To see how this principle works in application, consider the facts at issue in the Supreme Court's decision in *Fox*. That case involved a First Amendment challenge to a public university's ban on commercial solicitations on campus. Several students and a housewares manufacturer asserted a free-speech right to hold "Tupperware parties" in the dormitories. *See id.* at 472. These gatherings consisted of demonstrations and a sales pitch for the manufacturer's products, but they also touched on other, noncommercial subjects, such as "how to be financially responsible and how to run an efficient home." *Id.* at 473–74. The plaintiffs maintained that the commercial and noncommercial elements of the speech were inextricably intertwined and the whole should be treated as noncommercial speech. *Id.* at 474.

The Supreme Court rejected this argument and analyzed the case under the standard applicable to commercial speech. In so doing, the Court clarified the limited applicability of the inextricably intertwined doctrine:

> [T]here is nothing whatever "inextricable" about the noncommercial aspects of these [Tupperware party] presentations. No law of man or of nature

> makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares. Nothing in the [university rule] prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages.

*Id.*

Properly understood, then, the inextricably intertwined doctrine applies only when it is legally or practically impossible for the speaker to separate out the commercial and noncommercial elements of his speech. In that situation the package as a whole gets the benefit of the higher standard of scrutiny applicable to noncommercial speech. But simply combining commercial and noncommercial elements in a single presentation does not transform the whole into noncommercial speech.

The district court relied on the Ninth Circuit's decision in *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001), but there the court misapplied the inextricably intertwined doctrine. *Hoffman* involved a fashion article featuring popular movie stills that had been altered to make it appear as though the actors were modeling clothing from famous designers. *Id.* at 1183. One of the photoshopped images was of Dustin Hoffman in his role in the film "Tootsie." Hoffman sued the magazine publisher for misappropriating his identity. The Ninth Circuit held that the article was fully protected noncommercial speech: "[T]he article as a whole is a combination of

fashion photography, humor, and visual and verbal editorial comment on classic films and famous actors. Any commercial aspects are 'inextricably entwined' with expressive elements, and so they cannot be separated out 'from the fully protected whole.'" *Id.* at 1185 (citing *Gaudiya Vaishnava Soc'y v. City & County of San Francisco*, 952 F.2d 1059, 1064 (9th Cir. 1990)).

This use of the inextricably intertwined doctrine was mistaken; no law of man or nature prevented the magazine from publishing a fashion article without superimposing the latest fashion designs onto film stills of famous actors.[8] The district court's application of *Hoffman* here made the same mistake. The commercial and noncommercial elements of Jewel's ad were not inextricably intertwined in the relevant sense. No law of man or nature compelled Jewel to combine commercial and noncommercial messages as it did here.

To wrap up, we hold that Jewel's ad in the commemorative issue qualifies as commercial speech. This defeats Jewel's constitutional defense, permitting Jordan's case to go forward. We note that the lone federal claim in the suit—a false-endorsement claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)—requires proof that Jewel's congratulatory ad caused a likelihood of confusion that Jordan was a Jewel-Osco sponsor or endorsed its products and services. *See, e.g., Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1014–15 (3d Cir. 2008). Because the merits have not been briefed, we express no

---

[8] Our focus here is on the Ninth Circuit's treatment of the inextricably intertwined doctrine; we have no comment on other aspects of *Hoffman* or its outcome.

opinion on the substance of Jordan's claims under the Lanham Act or any of the state-law theories. We remand to permit the parties to address whether the Lanham Act claim warrants a trial, and if not, whether the district court should retain or relinquish supplemental jurisdiction over the state-law claims. *See* 28 U.S.C. § 1367(c); *Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 941 (7th Cir. 2012).

REVERSED AND REMANDED.

# A P P E N D I X

